The DUPLAN CORPORATION,
Plaintiff,

v.

DEERING MILLIKEN, INC., et al.,
Defendants.

DEERING MILLIKEN RESEARCH
CORPORATION, Plaintiff,

v.

The DUPLAN CORPORATION and Burlington Industries, Inc., Defendants.

The DUPLAN CORPORATION et al.,
Plaintiffs on the Counterclaim,

v.

DEERING MILLIKEN RESEARCH CORPORATION, Defendant on the Counterclaim,

and

Deering Milliken, Inc., et al., Additional Defendants on the Counterclaim.

Civ. A. Nos. 71–306, 70–968, 69–1096, 68–705, 69–777, 70–14, 70–189, 70–250, 70–295, 70–358, 70–385, 70–386, 70–391, 70–493, 70–622, 70–628, 70–677, 70–683, 71–87 to 71–102, 71–115, 71–126, 71–127 and 71–283.

United States District Court,
D. South Carolina,
Spartanburg Division.

May 30, 1974.

Supplemental Order Dec. 19, 1974.

Reconsideration Denied Feb. 13, 1975.

---

See also, D.C., 370 F.Supp. 761.

Leatherwood, Walker, Todd & Mann, Fletcher C. Mann, Greenville, S. C., Parrott, Bell, Seltzer, Park & Gibson, Charles B. Park, III, Charlotte, N. C., Willkie, Farr & Gallagher, David L. Foster, New York City, for The Duplan Corp., The Schwarzenbach-Huber Co., Jonathan Logan, Inc., Frank Ix & Sons Virginia Corp., Lawrence Texturing Corp., and United Merchants & Manufacturers, Inc.

Haynsworth, Perry, Bryant, Marion & Johnstone, O. G. Calhoun, Greenville, S. C., Cushman, Darby & Cushman, William K. West, Jr., Washington, D. C., for Burlington Industries, Inc., Madison Throwing Co., Leon Ferenbach, Inc., and National Spinning Co., Inc.

Perrin, Perrin & Mann, Edward P. Perrin, Spartanburg, S. C., David Rabin, Smith, Moore, Smith, Schell & Hunter, McNeill Smith, Greensboro, N. C., for Texfi Industries, Inc., Blanchard Yarn Co., Reliable Silk Dyeing Co., Spring-Tex, Inc., Hemmerich Industries, Inc., Texelastic Corporation, Dixie Yarns, Inc., and Olympia Mills, Inc.

Butler, Means, Evins & Browne, Thomas A. Evins, Spartanburg, S. C., Burns, McDonald, Bradford, Erwin & Few, Howard L. Burns, Greenwood, S. C., Paul, Weiss, Rifkind, Wharton & Garrison, Jay Greenfield, New York City, Morgan, Finnegan, Durham & Pine, Granville M. Pine, New York City, for Deering Milliken Research Corp., Deering Milliken, Inc., Moulinage et Retorderie de Chavanoz.

Ward, Howell & Barnes, Rufus M. Ward, Spartanburg, S. C., Brumbaugh, Graves, Donohue & Raymond, Granville M. Brumbaugh, Sr., New York City, for Ateliers Roannais de Constructions Textiles.

Robinson, McFadden & Moore, T. T. Moore, Columbia, S. C., Cooke & Cooke, Arthur O. Cooke, Greensboro, N. C., for ARCT, Inc.

## ORDER

ON MOTION FOR PRODUCTION OF DOCUMENTS UNDER FEDERAL RULES OF CIVIL PROCEDURE 34(a)(1) AND 26(b)(3).

HEMPHILL, District Judge.

This is one of several consolidated multi-district patent-antitrust lawsuits that has germinated as a result of the opening of Pandora's box in Lear, Inc. v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), in which the Supreme Court abolished the 180 year old doctrine estopping patent licensees from challenging the validity of the licensed patent.

During the course of five years of continuous discovery, counsel have estimated that more than one million documents have been produced to and from the 22 parties involved in this litigation. The owner of the patents and its allied parties[1] (hereinafter collectively referred to as plaintiff) have declined to produce approximately 4,500 documents for which claims of work product, attorney-client, trade secrets, and irrelevancy are asserted. The 17 former patent licensees (hereinafter referred to as the throwsters) have moved for production of all documents. This is the final roadblock facing this court before the two phases of the case, one involving alleged fraud, monopoly, restraint of trade and anti-trust issues, and the other, on which a jury trial has been requested, see General Tire & Rubber Co. v. Watkins, 331 F.2d 192 (4th Cir. 1964), cert. denied, 377 U.S. 952, 84 S.Ct. 1629, 12 L.Ed.2d 498 involving infringement, validity and other patent issues, can be scheduled to take place. At this time these issues, separated for management purposes are divided, and the sequence or schedule of trial is indefinite, awaiting appellate decisions on issues.

## THE IN-CAMERA PROCEEDINGS

During the course of discovery, plaintiff has withheld production of approximately 4,500 documents. At times of resistance the court required briefs to be submitted and heard arguments concerning whether the claimed privilege should apply. The court then reserved judgment until discovery was completed and all contentions[2] of the parties were submitted. This was done so that the court would have a clear view of the background against which to decide the applicability of the privileges claimed.

On August 3, 1973, this court ordered plaintiff to prepare a list of its privileged documents for the court and for opposing counsel. The order required identification by number, date, author, addressee, recipients of copies, and the nature of the document. Plaintiff complied in some respects but interpreted the term "nature of the document" to be limited to a notation as to whether the document was a letter, memo, etc. on which company stationery it was prepared. Alleging failure of compliance with the order, the throwsters moved for immediate production of all documents for which a claim of privilege was asserted on the grounds that plaintiff had failed to comply with the court's order

---

[1]. The owner of the 22 patents in suit is Moulinage et Retorderie de Chavanoz, a French corporation doing business in the United States. Its associates, as dubbed by its own counsel, are: ARCT-France, a French corporation and exclusive U. S. manufacturing-licensee under the patents; ARCT, Inc., a U. S. subsidiary of ARCT-France and exclusive U. S. sales-licensee under the patents. DMI, the patent of DMRC, Inc.; and DMRC, the exclusive U. S. use-licensee under the patents. Whitin Machine Works, Whitinsville, Massachusetts, the former exclusive U. S. sales-licensee un-

der the patents is not a party to this suit. 35 U.S.C. § 154 (1965) provides:

Every patent shall contain . . . a grant to the patentee, his heirs or assigns, for the term of seventeen years, . . . of the right to exclude others from *making*, *using*, *or selling* the invention throughout the United States . . . . (Emphasis added to indicate three different types of exclusive rights involved.)

[2]. See the appendix attached hereto for the throwsters' contentions.

by insufficiently disclosing the nature of each document. Plaintiff countered that under its "interpretation" of the order and because of the privileges asserted, the information supplied was all that was required to satisfy the order, lest the privilege be turned into an empty right by disclosing too much.

Partially because of the possible ambiguity engendered by the court's semantics but, more importantly, in order to focus on the issues raised for decision in this order, the court undertook a painstaking initial in-camera review of each of the 4,500 documents. This procedure was decided upon after consultation with various appellate and district judges as to a recommended course of conduct. In making the initial in-camera review, the court dictated approximately 130 dictabelts of its impressions on the nature of the documents.[3] These were transcribed in rough form by the court's secretary into an index of 405 double-spaced, legal-size pages, which was made available to plaintiff, but not to the throwsters.

Thereafter, the court reviewed its index in-camera with assistant counsel for plaintiff. The attorney objected to certain disclosures of information and suggested editing of notes on other documents. Counsel for Chavanoz, DMRC, and ARCT–France agreed to produce approximately 50 documents after the court expressed misgivings about the applicability of the privilege. A record of the proceedings was turned over to the throwsters with the edited (but not the original) index. The court allowed counsel to have his way but expressed reservations at appropriate points for the record.[4] This phase of the in-camera proceedings lasted ten days.

The court then prepared a proposed memorandum of the guidelines to be used in ruling upon the issues raised by the various documents initially reviewed. Thereafter, the court heard arguments from all parties on the proposed guidelines. These arguments were exhaustive and lasted ten hours over the course of two days.

In response to these observations, the court amended its guidelines. The final version is this order. Hereafter, after examining the edited index, the record of the in-camera proceedings with plaintiff's counsel, the arguments presented, and this order, the throwsters will submit three lists of documents. The throwsters will give up the chase for those documents in List A. List B will enumerate those documents to which the throwsters believe they are entitled but which they expect the court will disallow production. List C will cover those documents to which the throwsters believe they are entitled under this order. Plaintiff will simultaneously prepare, if it so desires, a List D of documents which it will surrender for production under this order without further contest of any privilege and without waiver of any other rights as to other documents. Oral arguments will thereafter be heard on the applicability of this order to each of the remaining contested documents in throwsters' List C. The court will then proceed to examine the remaining contested documents in throwsters' List C in a more carefully undertaken final in-camera review.

The reason for conducting such a long-drawn out procedure was to insure that the parties requesting production of the privileged documents had at least a realistic conception of what each document contained and were not foreclosed from an opportunity to argue intelligently before this court, and, if so advised, argue on appeal whether the court

---

3. The court had to re-dictate notes on some documents because tape #39 was blank and there was a 14 minute gap of humming in tape #72.

4. At times while the colloquy with counsel was being taped, remarks were made by the court as to the nature of the document that counsel asked to be stricken. The court thereupon ordered the court stenographer to erase objectionable parts of the tape recordings of the proceedings.

abused its discretion where its decision called for the denial of production of documents claimed to be privileged. Of course, the court had to balance this consideration against the unwarranted disclosure of the truly privileged subject matter. See the order issued earlier in this case by District Judge (now Circuit Judge) Russell appearing at 320 F.Supp. 806 (D.S.C.1970).

■ In fairness to the party seeking production, the court finds that such a party, in the face of the work product and attorney-client privileges, is entitled to know at least what was the general subject of discussion. For example, if during the course of litigation, documents are generated and production is later sought, the party seeking production may be informed by the court reviewing the documents that they discuss anticipated litigation, responsive pleadings, pretrial strategy, expert witnesses, trial tactics, appellate procedures, or settlement. Also, if a client seeks legal advice and documents are likewise generated, the party seeking production may be informed by the court reviewing the documents that they discuss the law of patent validity, patent infringement, patent misuse, antitrust, or monopoly. More specific notations as to the trial preparation material and as to the legal advice sought should not be given in order to retain the confidentiality of the particular written or taped communication, if such privilege is deserved. American Optical Corp. v. United States, 180 U.S.P.Q. 143, 144–145 (Ct.Cl.1973); Jack Winter, Inc. v. Koratron Co., 54 F.R.D. 44, 48–50 (N.D.Cal.1971); United States v. Anderson, 34 F.R.D. 518, 523–525 (D.Colo.1963).

## WORK PRODUCT PRIVILEGE

In its order of February 5, 1974, presently on appeal before the Fourth Circuit, the court set forth the guidelines that it intended to apply in its consideration of the work product privilege In that order and a previous but related unpublished order of December 21, 1973,

the court ruled on 154 documents for which a work product privilege for prior terminated litigation was asserted.

The court determined that, upon a showing of substantial need and undue hardship, both factual and opinion work product documents from *prior terminated* litigation became discoverable only if the documents contained operative facts relevant to issues involved in the present litigation. This court interpreted the absolute admonition against court-ordered disclosure of opinion work product "concerning *the* litigation" contained in Federal Rule of Civil Procedure 26(b)(3) to be limited to a currently pending lawsuit.

Since no documents ruled upon at that time dealt with current litigation, the court's discussion of the work product privilege for such documents was purely dictum.

■ The court determined that, upon a showing of substantial need and undue hardship, factual work product documents from *current* litigation became discoverable only if the documents contained operative facts relevant to issues involved in the present litigation. Opinion work product from such current litigation was absolutely privileged from discovery in view of Rule 26(b)(3) protecting against disclosure of attorney's opinions, despite the fact that such work product documents may contain operative facts relevant to the present litigation.

Having heard no compelling reasons for changing its analysis, the court hereby adopts its prior reasoning as it applies to the documents for current litigation presently under consideration.

To allow discovery of opinion work product for current litigation during the course of the pending litigation would be, in effect, to ignore Rule 26(b)(3). No "operative facts" exception can be recognized for current litigation such as the court recognized for prior terminated litigation, because to do so would cause the exception to swallow the rule. Everytime an attorney puts his or her

opinion in writing during pending litigation on an issue involved in the lawsuit, the opinion would become an "operative fact" discoverable by the opposition. Allowance of such discovery would effectively destroy the work product privilege.

## ATTORNEY-CLIENT PRIVILEGE

This part of this order sets forth the guidelines that the court intends to apply in its consideration of the attorney-client privilege. The court is keenly aware that its decision calls for a balancing of the need for confidentiality in attorney-client relationships against full disclosure of all material facts in the court's search for truth and justice. In thrashing about the jungle of the attorney-client relationship, several issues have raised their ugly heads which must be resolved.

### Issues

I. Does the voluntary waiver without limitation of one privileged document between a certain attorney and a certain client discussing a certain subject waive the privilege as to all communications between the same attorney and the same client on the same subject?

II. Since communications between an attorney and a corporate client must necessarily be with individual employees of the corporation, to what persons within the control group of each corporation and their representatives must communications be limited before the burden of proving an attorney-client relationship is carried?

III. When are communications with an attorney serving in a corporate patent department protected by the attorney-client privilege?

IV. When are communications with foreign patent agents protected by the attorney-client privilege?

V. Are communications made before, during, and after the fact of the commission of a crime, fraud, or tort between an attorney and persons within the control group of the corporate client or their representatives protected by the attorney-client privilege?

VI. Did the patent owner and its associates have a sufficient "community of interest" in prior terminated litigation so that the circulation of communications (between a certain attorney and certain persons within the control group of one corporate client or their representatives discussing a certain subject) to all other interested parties does not waive the attorney-client privilege?

### Analysis

Prior to a detailed, document by document, consideration of the claimed attorney-client privilege it is necessary to set forth the principles of law upon which this court must make its determination. The leading case on the attorney-client privilege in this circuit is N.L.R.B. v. Harvey, 349 F.2d 900 (4th Cir. 1965) and it is to *Harvey* which this court looks for its primary guidance. While not at all factually similar to the questions facing this court, in that in *Harvey* the claimed privilege went to the identity of an attorney's client, the basic principles of law set forth in *Harvey* are clearly controlling in this case.

As to the scope of the privilege, Circuit Judge Butzner quotes with approval the following from 8 Wigmore, Evidence § 2292, at 554 (McNaughton rev. 1961):

> * * * the privilege remains an exception to the general duty to disclose. Its benefits are all indirect and speculative; its obstruction is plain and concrete. * * *. It is worth preserving for the sake of a general policy, but it is nonetheless an obstacle to the investigation of the truth. It ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle. *Harvey*, at 907. (Citation omitted.)

The Fourth Circuit went on to state that:

> The responsibility of determining whether the privilege exists rests upon the District Judge and not upon

the lawyer whose client claims the privilege. *Id.*

The court in *Harvey* also quotes with approval Professor Wigmore's statement of the essentials of the privilege which are:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived. 8 Wigmore, Evidence § 2292 (McNaughton rev. 1961). *Id.* at 904.

as well as the definition of the privilege set forth in United States v. United Shoe Machinery Corp., 89 F.Supp. 357 (D.Mass.1950) which stated:

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client. *Id.* at 358.

The latter quote has been previously relied on by this court as being authoritative in Small Business Administration v. Baron, 240 F.Supp. 434 (W.D.S.C.1965), and in this court's unappealed order in this case appearing at 370 F.Supp, 761 (D.S.C.1972). It necessarily follows from the fourth requirement quoted from *United Shoe Machinery,* supra, 89 F.Supp. at 358, that the privilege must be claimed at the time production is requested, or at least, when the document is presented to the court for in-camera review. If the privilege is not claimed at that time, it will be considered waived by implication. The court refuses to be burdened by belated claims of privilege for so many documents.

It has been urged upon this court that additional guidance in this area is provided by Rule 503 of the proposed Rules of Evidence for United States Courts and Magistrates.[5] This proposition must be rejected on two grounds: (1) at the present time these rules are not in effect but are merely proposed and are in fact the subject of strenuous objections from numerous authorities;[6] (2) after a careful reading of proposed Rule 503, it appears to this court that the rule brings about an extension of the existing privilege, and that to follow its guidelines would be to defy the clear mandate of *Harvey* to "strictly confine [it] within the narrowest possible limits consistent with the logic of its principle." *Harvey,* supra, at 907. Indeed, the provision of Rule 503(a)(4),[7] when read in conjunc-

---

5. P.L. 93–12 (1973).

6. This court is of the opinion that an attempt to codify the rules of evidence to be used in the federal trial system would produce thousands of issues of interpretation across the land. Pending the finality of those interpretations the bench and bar would be left to wander in a morass of uncertainty. Evidence rules are best made by trial-experienced appellate judges. Enough uncertainty as to the law exists in the courts today without a new spectrum of endless litigation in the United States.

7. Proposed Rule 503(a)(4) provides:

A communication is "confidential" if not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication.

tion with proposed Rule 503(b)[8] are so broad as to be almost unlimited. There is no definition of "representatives of the client" included in proposed Rule 503. Similarly, there is no definition, qualification, limitation, or explanation of the phrase "in furtherance of the rendition of professional legal services". Such an open ended approach does nothing to clarify existing questions in this area and in fact appears to broaden and further confuse the scope of the attorney-client privilege.

■ There can be little doubt in the case of in-camera review of documents that the burden of proof should be upon the party asserting the claim of privilege. The adversary party, by virtue of the obvious fact that it has not seen the documents, cannot be expected to bear the burden of establishing a lack of privilege. The mere existence of an attorney-client relationship does not raise a presumption of confidentiality. 8 Wigmore, Evidence, § 2311 (McNaughton rev. 1961). As was observed in Comercio E Industria Continental, S. A. v. Dresser Industries, Inc. 19 F.R.D. 513 (S.D.N.Y.1956), each of the eight conditions set out in 8 Wigmore Evidence § 2292, at 554 (McNaughton rev. 1961) must be satisfied before the claimed privilege will attach to a communication. Thus, a communication between an attorney and a client is not privileged unless it is necessary for the rendition of a legal opinion or legal advice.

With respect to a large number of the documents now before the court, it is not the lack of an attorney-client relationship which is asserted by the throwsters; but rather the waiver of any privilege which may have existed by the parties asserting the privilege. The alleged waivers fall into several distinct categories which must be considered separately, although the categories often overlap, and are all predicated on a limited disclosure of the contents of the document to persons allegedly outside of the permitted area of privilege.

## I

■ The voluntary waiver by a client, *without limitation,* of one or more privileged documents passing between a certain attorney and the client discussing a certain subject waives the privilege as to all communications between the same attorney and the same client on the same subject. The authorities for this general rule are numerous. A few cases with fact patterns similar to the present situation should suffice: Western Union Telegraph Co. v. Baltimore & Ohio Telegraph Co., 26 F. 55 (C.C.S.D.N.Y.1885) (the client's use of extracts of communications with an attorney concerning a reissued patent was held to be a waiver of the privilege as to the remainder of all similar communications); In re Associated Gas & Electric Co., 59 F.Supp. 743 (S.D.N.Y.1944) (by voluntarily producing and testifying to certain privileged documents in an earlier hearing, a client was held to have waived its privilege for all other correspondence on the same subject); Bierman v. Marcus, 122 F.Supp. 250 (D.N.J. 1954) (a client's testimony on a specific communication waives all other communications on the same matter).

When a client voluntarily waives the privilege as to some documents that the client considers not damaging and asserts the privilege as to other documents that the client considers damaging, the rule compelling production of all documents becomes applicable. The reason

8. Proposed Rule 503(b) provides:
General Rule of Privilege. A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client, (1) between himself or his representative and his lawyer or his lawyer's representative, or (2) between his lawyer and the lawyer's representative, or (3) by him or his lawyer to a lawyer representing another in a matter of common interest, or (4) between representatives of the client, or (5) between lawyers representing the client.

behind the rule is one of basic fairness. The rationale of the rule was aptly stated in 8 Wigmore, Evidence, § 2327 (McNaughton rev. 1961):

> He [the client] cannot be allowed, after disclosing as much as he pleases, to withhold the remainder. He may elect to withhold or to disclose, but after a certain point his election must remain final. *Id.* at 636.

A waiver of the privilege as to all communications ordinarily follows from the voluntary waiver even if made *with limitations* of one or more similar communications. Thus, if a client, through his attorney, voluntarily waives certain communications, but guarded with a specific written or oral assertion at the time of the waiver that it is not its intention to waive the privilege as to the remainder of all similar communications, the privilege, as to the remaining undisclosed communications, is nevertheless waived.

■ Plaintiff's argument that waiver requires an intentional relinquishment or abandonment of a known right has a familiar ring with regard to general contract law, but waiver, as applied to the particular subject of attorney-client privilege, may be made by implication:

> A privileged person would seldom be found to waive, if his intention not to abandon could alone control the situation. There is always also the objective consideration that when his conduct touches a certain point of disclosure, fairness requires that *his privilege shall cease whether he intended that result or not.* 8 Wigmore, Evidence § 2327 (McNaughton rev. 1961). (Emphasis added).

An argument similar to that presented by plaintiff was made and rejected in Underwater Storage, Inc. v. U. S. Rubber Co., 314 F.Supp. 546, 548 (D.D.C. 1970), in which the court ably put forth the reason behind the rule:

> The document in question, a letter from Mr. Wiczer to Dr. Quase, was presented by the plaintiff pursuant to a consent order for examination by the defendant. The plaintiff now claims that the production was inadvertent and involuntary or if it is deemed voluntary that the privilege is waived only as to the piece of paper but nothing else. This is an untenable position. The plaintiff turned over to his attorney the documents to be produced. This letter was among them. The Court will not look behind this objective fact to determine whether the plaintiff really intended to have the letter examined. Nor will the Court hold that the inadvertence of counsel is not chargeable to his client. Once the document was produced for inspection, it entered the public domain. Its confidentiality was breached thereby destroying the basis for the continued existence of the privilege.

Accord, United States v. Kelsey-Hayes Wheel Co., 15 F.R.D. 461, 465 (E.D. Mich.1954).

In support of its argument, plaintiff cited Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). The case involved a "presumption against waiver" by a *criminal* defendant of his constitutional right to counsel, and is not relevant here.

■ There can be no "presumption against waiver" of the attorney-client privilege in view of the statement of policy adopted by the Fourth Circuit in N.L.R.B. v. Harvey, supra, 349 F.2d at 907:

> * * * the privilege remains an exception to the general duty to disclose. Its benefits are all indirect and speculative; its obstruction is plain and concrete. * * *. It is worth preserving for the sake of a general policy, but it is nonetheless an obstacle to the investigation of the truth. It ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle. 8 Wigmore, Evidence § 2292 (McNaughton rev. 1961).

The other cases cited by plaintiff, to wit, Connecticut Mutual Life Ins. Co. v. Shields, 18 F.R.D. 448 (S.D.N.Y.1955) and In re Associated Gas & Elec. Co., 59 F.Supp. 743 (S.D.N.Y.1944), deal with § 354 of the New York Civil Practice Act. To the extent that these cases require evidence of specific intent to waive the privilege, they are inconsistent with the Fourth Circuit's mandate in *Harvey*, supra, which is binding on this district court.

■ Although the client's intention is generally not controlling, this court will not adopt this attitude where the voluntary waiver of some communications was made upon the suggestion of the court during the course of the in-camera proceedings. Persuasive authority is found for this course of action in Schaffer v. Below, 278 F.2d 619 (3d Cir. 1960) in which a series of letters between an attorney and his client were kept in the files of a third-party corporation. Prior disclosure by production of the letters by the corporation in response to a court subpoena was held not to destroy the client's privilege. In United States v. Insurance Board, Trade Cas. ¶ 67,873 (N.D.Ohio 1954), and United States v. New Wrinkle, Inc., Trade Cas. ¶ 67,883 (S.D.Ohio 1954), the federal government had, upon request, been permitted to freely inspect corporate files and records of defendants. Under these circumstances, the federal district courts ruled that no waiver should result from the defendants' voluntary cooperation with the federal government. In *New Wrinkle, Inc.*, supra, the court stated:

If Government agents come into a place of business and ask or demand to see files and records, and in a spirit of cooperation, the files and records are turned over to the agents by the business, it does not, in the opinion of this Court, constitute a voluntary turning over of records which can be claimed by the Government as a waiver. There is at least an implied coercion in a request or demand made by Government agents.

## II

Communications between an attorney and a corporate client must necessarily be with individual employees of the corporation. In strictly construing the attorney-client privilege, this court will apply two tests seriatim: first, the "control group" test; second, the "subject matter" test.

■ As to the test to be applied initially, the court will require communications between an attorney and a corporate client to be limited to persons within the "control group" of each corporation and those agents, employees, and representatives acting at the direction of a control group member. Documents which have passed around the offices of a corporation for review by all who care to read them cannot have the attorney-client privilege attach. Such communications from an attorney to the corporate client do not have the requisite confidentiality to warrant the attorney-client privilege.

■ A definition of a person within the corporate control group is aptly given in Natta v. Hogan, 392 F.2d 686, 692 (10th Cir. 1968) involving production of documents from a pending interference in the U. S. Patent Office.

We believe that the test is whether the person has the authority to control, or substantially participate in, a decision regarding action to be taken on the advice of a lawyer, or is an authorized member of a group that has such power. (Footnote omitted.)

The case that first advanced the "control group" test was Philadelphia v. Westinghouse Electric Corp., 210 F. Supp. 483 (E.D.Pa.1962), which made an in-depth analysis of the problem. Where there is doubt as to whether an individual is within the control group of a corporation, the doubt will be resolved against the party asserting the privilege.

For many individuals, the parties asserting the privilege in this case identified persons simply as an "employee," "manager," "representative", or "officer". Such identification is insufficient for the court to establish the person as a member of the corporate control group or an agent acting under such a member's direction. Nevertheless, this court concludes that, under the circumstances of modern corporate business practice, the parties asserting the attorney-client privilege will not necessarily be considered to have failed to carry its burden of proof to establish the privilege. Only where communications are between an attorney and members of the corporate control group, as well as corporate personnel *not* acting at the direction of a member of the control group, this court will consider the privilege to be waived.

Without abandoning the case law, but for the purpose of taking a common sense look at the practicalities of the "control group" test and its applicability in the day-to-day workings of a lawyer, it is obvious that, in a society such as exists in the United States today, a client, whether an individual or a corporation, frequently has to communicate through an agent. Life in America, today, is admittedly of such complication as to forego the expectation that one person can do all things for himself. The chain of command in military, business, government, and private societies is an accepted pattern of modern civilization.

A corporation, of course, can only communicate through an agent. Obviously, if a corporation needs legal advice, it cannot deal solely through the chairman of the board of directors. There has to be a sufficient number of persons within a corporation who are authorized on behalf of the corporation to seek advice, to give information with respect to the rendition of advice, and to receive advice. A corporate system would break down if such were not permissible.

If only one, two, three, or four persons within a corporate structure could be the corporation when it must seek legal advice, then, for all practical purposes, any corporation would not have an effective attorney-client privilege. The chairman of the board and other top executives necessarily have more important matters to attend to than gathering information for either outside or inside counsel.

This is an antitrust case. If the chairman of the board and the president of a corporation were to seek advice on antitrust law, the only way that a lawyer can really understand how a corporation operates, what it is doing, and what it can do within the confines of the antitrust laws, is to go out into the branch offices and into the field to make the rounds with the salesmen. After the lawyer forms his or her opinion, it is of no immediate benefit to the chairman of the board or the president. It must be given to the corporate personnel who will apply it. If an attorney cannot make enquiries of salesmen and if the attorney cannot give advice to the corporate personnel who will apply it, then a corporation would be reluctant to seek legal advice since its confidential communications would not be protected by the attorney-client privilege. This court recognizes that it is not the federal government that is primarily responsible for enforcement of the federal antitrust laws but rather the lawyers who advise their corporate clients. Unless corporate personnel on a fairly low level can speak to attorneys in confidence, the enforcement of the federal antitrust laws is likely to be adversely affected.

This is also a patent case. Before anyone in business wants to modify a machine where there are patents in the area, the opinion of a patent attorney should be obtained. The chairman of the board probably would not come to meet with the patent attorney since he probably could not explain the problem well enough. To find out what is ac-

tually going on so he can render advice on what type of modification infringes, what type of modification might not infringe, and whether the patents in the particular area are valid, the patent attorney would have to speak to the corporate technical personnel down in the ranks—how far down depends on the particular problem.

Thus, the main consideration is whether the particular representative of the client, to whom or from whom the communication is made, is involved in rendering information necessary to the decision-making process concerning a problem on which legal advice is sought. One can envision that in some situations, the attorney has to go far down in the ranks; in other instances, the attorney can obtain the necessary information close to the top. The extent of the attorney-client privilege will vary with the individual situation; the climates are seldom identical.

██ Therefore, after a document passes the "control group" test, the court will apply the "subject matter" test. The simple fact that a communication occurs between an attorney and a member of a corporate control group or a representative thereof is insufficient to create an attorney-client privilege. The communication must be incident to a request for or the rendition of legal advice. If such a state of affairs is presented, the communication will be considered to have passed the "subject matter" test.

The rejection of the "control group" test as the sole test for determining the existence of the attorney-client privilege and the establishment of the "subject matter" test as a necessary corollary to the "control group" test occurred in Harper & Row Publishers, Inc. v. Decker, 423 F.2d 487, 491–492 (7th Cir. 1970), affirmed per curiam by an equally divided court, 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433 (1971):

> We conclude that the control group test is not wholly adequate, that the corporation's attorney-client privilege protects communications of some corporate agents who are not within the control group. . . . .

> &ast;&ast;&ast;&ast;&ast;&ast;

> We conclude that an employee of a corporation, though not a member of its control group, is sufficiently identified with the corporation so that his communication to the corporation's attorney is privileged where the employee makes the communication at the direction of his superiors in the corporation and where the subject matter upon which the attorney's advice is sought by the corporation and dealt with in the communication is the performance by the employee of the duties of his employment.

Such a two-pronged approach is a better method for determining the existence of the privilege than the application of only the "control group" test.

In accordance with the above standards and as a result of the identification of the numerous individuals associated with the various corporations involved in the subject matter of this litigation, this court makes the following findings as to who is a member of the control group for each corporation; who is an agent, employee, or representative acting at the direction of a control group member; and who is an attorney (solicitors and barristers in Great Britain; avoues and avocats in France) for that corporate client. Part of this voluminous list results from the fact that some individuals wore several hats.

Control group members for ARCT–France: H. Crouzet, Chairman of the Board of Directors.

Agents, employees, or representatives acting for ARCT–France: C. Crouzet, President; Prat, Director-General of ACBF; Lapillonne, Sales Director of MAFO for France; Lauer, Sales Director of MAFO for Europe (except France and Mediterranean countries) and Far East; Fleurier, Director of Commercial Department; Neveux, Director of Technical-Commercial Department; Venot, Director of Research and Development;

Exbrayat, Director of False-Twist Division in Technical-Commercial Department; Goutorbe, Manager of Tests Service; Terasson, Technician, Tests Service; Buchet, Sales Engineer for France; Rouxel, Sales Engineer for Europe (except France and Mediterranean countries) and Far East; Derail, Engineer, Research Department; Dupeuble, Engineer, False Twist Division in Technical-Commercial Department; Soep, independent patent agent; Laurent, independent patent agent.

Attorneys for ARCT–France in the United States: Brumbaugh, Sr., Buckner, Neary.

Control group members for ARCT, Inc: H. Crouzet, President.

Agents, employees, or representatives acting for ARCT, Inc: Waters, Vice-President.

Attorneys for ARCT, Inc. in the United States: Brumbaugh, Sr., Buckner, Cooke, Moore, Neary.

Control group members for Chavanoz: Jubert, Member of Board of Directors; Mollard, Member of Board of Directors; DeMoncuit, former President; Lauchausee, former Vice-President.

Agents, employees, or representatives acting for Chavanoz: Soep, independent patent agent; Laurent, independent patent agent; Morel, Director of DAPID; Rosset, Manager of Patent Department of DAPID; Martin, patent agent in Patent Department of DAPID; Prud' Homme, patent agent in Patent Department of DAPID; Vuillermoz, Manager of Licensing Department of DAPID; Petit, Executive of Licensing Department of DAPID; Bottcher (formerly Cervoni), attache of the Director-General; Deltour, Research Engineer; Chatin, former Director of Research; Stieffenhofer, present Director of Research.

Attorneys for Chavanoz in Canada: Gowling, Robinson.

Attorneys for Chavanoz in France: Beaume, Boyer-Chammard, Brun, Cambez, Jacques, Jean, Lassier, LeTarnec, Marconnet, Vialat, Dapid.

Attorneys for Chavanoz in Great Britain: Graham, Lyons, Smith-Cresswell, Stanley.

Attorneys for Chavanoz in Canada, Mexico, and the United States: Brumbaugh, Sr., Brumbaugh, Jr., Conners, Kardis, Kemon, Leek, Lockner, Neary, Poag, Rotert, Sears, Shalloway, Updike, DMRC patent department.

Control group members for DMI: Milliken, President.

Agents, employees, or representatives acting for DMI: Cocoros, Plant Manager at Magnolia; Sibley, Manager at Judson and Laurens; Bailey, Production Manager at Judson; Collett, Comptroller for Judson, Laurens, and Gayley; Lowry, General Manager of DMSC; Byrd, Manager of Purchasing Department of DMSC; Blomgren, Salesman; McKay, Salesman; Sides, Salesman; Ballentine, Secretary.

Attorneys for DMI in the United States: Armitage, Brumbaugh, Sr., Brumbaugh, Jr., Buckner, Houston, Liebowitz, Lockner, McCarville, Neary, Poag, Sears, Updike.

Control group members for DMRC: Ray, former President; Cogan, present President; Armitage, former Vice-President.

Agents, employees, or representatives acting for DMRC: Pettiss, Manager of General Licensing Division; Johnston, Manager of Textured Yarn Department of the General Licensing Division; Hooper, Manager of Development Division; Moss, Product Manager of Textured Yarn Department of the General Licensing Division; Gagarine, Manager of Chemical Research Division; Morgan, Manager of Development Department; Michener, Manager of Physics and Electronics Department; Dusenbury, Engineer; Evans, Engineer; Klein, Engineer; Whitworth, Engineer; Reidy, Head Librarian; Wethington, Secretary. Attorneys for DMRC in Canada: Gowling, Henderson, Robinson.

Attorneys for DMRC in Germany: Gewiese, Puls.

Attorneys for DMRC in Mexico: Berge, Fraga.

Attorneys for DMRC in the United States: Armitage, Brody, Brumbaugh, Sr. , Brumbaugh, Jr., Buckner, Conners, Finell, Greenfield, Houston, Jones, Kardis, Kemon, Laprade, Liebowitz, Lockner, Marcus, Miller, Moseley, Mueller, Neary, Petry, Pine, Pippin, Poag, Proctor, Rifkind, Rotert, Sears, Smith, Topkis, Updike, White, Wilburn.

Control group members for Whitin: Bolton, Sr., President.

Agents, employees, or representatives acting for Whitin: Bolton, Jr., Vice-President of Marketing; Swift, Vice-President of Research; Waters, Sales Manager; West, Engineer.

Attorneys for Whitin: Brumbaugh, Sr., Brumbaugh, Jr., Buckner, Lockner, Neary, Poag, Sears, Smith, Updike.

### III

The third issue for resolution concerning the attorney-client relationship calls for a determination as to when are communications with an attorney serving in a corporate patent department protected by the attorney-client privilege. This issue raises the more basic problem as to whether or not a corporation may simultaneously be its own attorney and its own client for the sake of the privilege. Phrased in this manner, the issue may seem a bit incongruous but the court's research indicates that courts that have faced the issue have answered it in the affirmative.

■ The first question involves communications between an attorney serving in a corporate patent department and persons within the control group of the corporate client or their representatives. The key considerations in the determination of all the courts appear to be whether the corporate patent department members were attorneys and whether such members were giving legal advice. It did not matter that the members were "inside" or "outside" house patent counsel as long as they were at-torneys giving legal advice. American Optical Corp. v. Medtronic, Inc., 175 U. S.P.Q. 635 (D.Mass.1972); Rayette-Faberge, Inc. v. John Oster Mfg. Co., 47 F.R.D. 524 (E.D.Wis.1969); International Business Machines Corp. v. Sperry Rand Corp., 44 F.R.D. 10 (D.Del. 1968); United States v. United Shoe Machinery Corp., 89 F.Supp. 357 (D. Mass.1950). This court agrees and will adopt this general rule.

It should be noted that the court has found that the attorney-client privilege does not attach where the patent attorney is giving technical or business, as opposed to legal, advice. In re Natta, 264 F.Supp. 734 (D.Del.1967) (technical advice); Jack Winter, Inc. v. Koratron Co., 54 F.R.D. 44 (N.D.Cal.1971) (technical and business advice).

■ Perhaps more important is the second question that, once the corporate patent counsel is established as the "attorney" in dealings with the corporate control group members, may he or she turn around and label oneself as the "client" in dealings with outside attorneys. Again, although the question appears incongruous, the courts have consistently answered in the affirmative. Thus, communications between "inhouse" counsel seeking legal advice for the corporate client and outside counsel giving legal advice as an attorney are covered by the attorney-client privilege. Natta v. Zletz, 418 F.2d 633 (7th Cir. 1969); Dura Corp. v. Milwaukee Hydraulic Products, Inc., 37 F.R.D. 470 (E.D.Wis.1965); Georgia-Pacific Plywood Co. v. United States Plywood Corp., 18 F.R.D. 463 (S.D.N.Y.1956); Leonia Amusement Corp. v. Loew's, Inc., 13 F.R.D. 438 (S.D.N.Y.1952).

Moving to the merits of the attorney-client privilege for a corporate patent department and a corporation, the so-called "conduit" theory of patent prosecution has already been adopted by this court as the law of this case in its unappealed, unpublished order of January 5, 1972, incorporated in and made a part of this order by reference.

This court is aware that there is case law to the contrary in other jurisdictions. See Eutectic Corp. v. Metco, Inc., 61 F.R.D. 35 (E.D.N.Y.1973); Tech Serv, Inc. v. Black Clawson Co., 178 BNA PTCJ A-10 (S.D.Ohio, April 4, 1974). The fact that the prosecution of applications in the Patent Office is an ex parte proceeding resulting in a legal monopoly held for 17 years against the public compels this court to ignore contrary judicial authority elsewhere. This court will order production of documents generated by agents, attorneys, and inventors in the course of applying for a patent from the United States Patent Office. The Supreme Court has stated that public policy demands complete and candid disclosure by inventors, patent attorneys, and agents in their dealings with the Patent Office. Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). This court will require no less frankness when the validity of patents are contested in this federal trial court.

■■■ In light of the repeated admissions in this litigation to the effect that DMRC used no independent discretion in the filing of Chavanoz patents in this country but merely did whatever Chavanoz directed, DMRC will not be permitted to assert that it functioned in any capacity, as the patent attorney, other than as a conduit in the prosecution of Chavanoz' patents. E. g., Armitage deposition, Vol. VI–A at 170 and Vol. VI–F at 329–31; Petry deposition, Vol. III at 43–45; Petry affidavit, May 13, 1974, ¶ 7.

■■■ Furthermore, the conduit theory should not be limited to patent prosecution documents. It should extend to any materials submitted by a client to his attorney with the intent that they be passed on to a third party or to a file. With respect to such documents, the necessary element of confidentiality is lacking. Colton v. United States, 306 F.2d 633 (2d Cir. 1962); United States v. McDonald, 313 F.2d 832 (2d Cir. 1963); United States v. Tellier, 255 F.2d 441 (2d Cir. 1958), cert. denied, 358 U.S. 821, 79 S.Ct. 33, 3 L.Ed.2d 62; 8 Wigmore, Evidence § 2311 (McNaughton rev. 1961). It is axiomatic that if a document is not privileged in the hands of the client it does not become privileged merely because it is given to an attorney. E. g., Radiant Burners, Inc. v. American Gas Assn., 320 F.2d 314, 324 (7th Cir. 1963), cert. denied, 375 U.S. 929, 84 S.Ct. 330, 11 L.Ed.2d 262.

■■■ As a result, the following documents will not be considered within the attorney-client privilege:

(1) client authorizations to file applications and take other steps necessary to obtain registration;

(2) papers submitted to the Patent Office and appearing in the file wrapper of issued patents;

(3) compendiums of filing fees and requirements in the United States and foreign countries for patent applications;

(4) resumes of patent applications filed and registrations obtained or rejected (including dates and file or registration numbers);

(5) technical information communicated to the attorney but not calling for a legal opinion or interpretation and meant primarily for aid in completing patent applications;

(6) business advice, such as that related to product marketing;

(7) communications whose confidentiality has been waived;

(8) documents written by or obtained from third parties, even though attached to communications seeking or giving legal advice (these will be separated and classified as non-privileged);

(9) communications which pass through an attorney who acts only as a conduit for a third party or for a file; and

(10) transmittal letters or acknowledgement of receipt letters, devoid of legal advice or requests for such advice, and disclosing no privileged matters.

Authority for items (1)' through (8) of this list is this court's unappealed unpublished order of January 5, 1972 and Jack Winter, Inc. v. Koratron Co., 54 F.R.D. 44, 47 (N.D.Cal.1971).

Authority for item (9) is Colton v. United States, supra; United States v. McDonald, supra; United States v. Tellier, supra.

Authority for item (10) is American Optical Corp. v. United States, 180 U.S.P.Q. 143, 145 (Ct.Cl.1973).

## IV

▪ Whether or not communications with foreign patent agents are protected by the attorney-client privilege depends on the purpose of the particular communication. In this case, foreign patent agents were contacted by corporate control group members, their representatives, American attorneys, or foreign attorneys (solicitors and barristers in Great Britain, avoues and avocats in France) for one of four purposes: first, assistance in prosecuting patent applications in the United States; second, assistance in prosecuting patent applications in their own country; third, legal advice on foreign patent law; or, fourth, development of trial preparation materials for litigation.

Before reaching a decision on each of these types of communications, it is necessary to restate some basic factors to be considered since there is a clear split of authority among the federal courts.

▪ One of the essential elements of the attorney-client privilege, as set forth by the Fourth Circuit in *Harvey,* supra; by Judge Wyzanski in *United Shoe Machinery,* supra; and by this court in an earlier unappealed order in this case appearing at 370 F.Supp. 761 (D.S.C. 1972); is that the person, to whom a communication is made and is claimed to be within the attorney-client privilege, must be *a member of the bar of a court.* Plaintiff concedes that foreign patent agents are not attorneys but asserts that they are professional legal advisors.

▪ The federal courts have refused to extend the attorney-client privilege to encompass *American* patent agents. Benckiser G. m. b. H. v. Hygrade Food Products Corp., 253 F.Supp. 999, 1001–1002 (D.N.J.1966); *United Shoe Machinery,* supra, 89 F.Supp. at 360; Brungger v. Smith, 49 F. 124, 125 (C.C. D.Mass.1892). It appears ludicrous for the federal courts to confine the attorney-client privilege in dealings with United States patents to members of a bar, thereby excluding American patent agents, and at the same time to expand the privilege to include foreign patent agents. Yet, this anomalous result appears to have occurred in Celanese Corp. v. Leesona Corp., 58 F.R.D. 606 (S.D. Fla.1973) and Jack Winter, Inc. v. Koratron Co., 54 F.R.D. 44 (N.D.Cal.1971). Although these two latter decisions are more recent than the three former decisions, this court refuses to follow the rationale of the latter cases and will adopt the rule that no communications from patent agents, whether American or foreign, are subject to an attorney-client privilege in the United States.

▪ Article 378 of the French Penal Code and § 15(1) of the British Civil Evidence Act provide a cloak of privilege to communications between a client and a person who is not a member of a bar of a court, i. e., French conseil en brevets and British patent agents. These statutes are in contravention of the public policy of the United States as enunciated in the Federal Rules of Civil Procedure and the federal court decisions relating thereto. The federal rules are designed to promote discovery whereas these two foreign statutes necessarily restrict discovery. It is thoroughly established that comity will not be extended to foreign law or rights based thereon if it opposes settled public policy of the forum nation. See, e. g., 15A C.J.S. Conflict of Laws § 4(4), p. 393 (1967), and cases cited therein.

Therefore any communications touching base with the United States will be governed by the federal discovery rules

while any communications related to matters solely involving France or Great Britain will be governed by the applicable foreign statute. The principle of comity applies.

From this general proposition, the court will now proceed to resolve the four specific questions posed as a result of the different types of communications.

■ A. As to communications between foreign patent agents and corporate control group members, their representatives, American attorneys, or foreign attorneys, relating to assistance in prosecuting patent applications in the United States, no attorney-client privilege may attach thereto. This result follows, a fortiori, since no such privilege can attach to similar communications with American patent agents.

■ B. As to communications between foreign patent agents and foreign corporate control group members, their representatives, or foreign attorneys, relating to assistance in prosecuting patent applications in their own foreign country, the attachment of an attorney-client privilege depends on the law of the foreign country in which the patent application is filed. Comity requires such a result. There are two foreign countries for which a determination must be made in this order: France and Great Britain.

As to France, plaintiff argued that Article 378 of the French Penal Code requires French patent agents (conseil en brevets d' invention) to preserve the secrecy of certain confidential communications from clients. The article reads:

Doctors, surgeons and other health officers, as well as chemists, midwives and *all other persons who are depositories, by their* condition or *profession* or by temporary or permanent duties, *of secrets* which are entrusted to them, who, except in cases where the law obliges or authorizes them to be informers, shall have revealed such secrets, shall be punished by imprisonment of one month to six months and by a fine of 500 to 3,000 francs. (Emphasis added.)

In its unappealed order appearing at 370 F.Supp. 761 (D.S.C.1972), this court accepted the contention that this law was intended to apply to French patent agents. Because of this law, this court found that communications to or from a particular French patent agent, Leo Soep, now deceased, would be protected by the attorney-client privilege when prosecuting French patent applications and when acting as patent house counsel in France.

As to Great Britain, a British statute enacted in 1968 made privileged communications between British patent agents and their clients relating to the prosecution of patent applications in Great Britain. The Civil Evidence Act of 1968, § 15(1), 12 Halsbury's Statutes of England 927–28 (3d ed. 1969) reads:

15. Privilege for certain communications relating to patent proceedings.

(1) This section applies to any communication made for the purpose of any pending or contemplated proceedings under the Patents Act 1949 before the comptroller or the Appeal Tribunal, being either—

(a) a communication between the patent agent of a party to those proceedings and that party or any other person; or

(b) a communication between a party to those proceedings and a person other than his patent agent made for the purpose of obtaining, or in response to a request for, information which that party is seeking for the purpose of submitting it to his patent agent.

For the purposes of this subsection a communication made by or to a person acting—

(i) on behalf of a patent agent; or

(ii) on behalf of a party to any pending or contemplated proceedings, shall be treated as made by or

to that patent agent or party, as the case may be.

This court is therefore compelled to conclude that communications to or from British patent agents must be considered as within the scope of the attorney-client privilege for communications with foreign corporate control group members, their representatives, or foreign attorneys made *after* 1968 when prosecuting patent applications in Great Britain.

As to communications made *before* 1968, no such attorney-client privilege can attach. The NOTES to this statute state that "[c]ommunications with a patent agent have hitherto not been privileged; see Moseley v. Victoria Rubber Co. (1886), 55 L.T. 482."

C. Likewise, because of the two foreign statutes, comity requires a similar result when foreign patent agents in France and Great Britain are rendering legal advice to foreign corporate control group members, their representatives, or foreign attorneys on the patent law of their own country.

■■■■■ D. As to the fourth specific question concerning whether or not communications with foreign patent agents are protected by the attorney-client privilege when relating to the development of trial preparation materials, no attorney-client privilege can attach for litigation in the United States because foreign patent agents are not attorneys. An attorney-client privilege may attach for litigation in their own country because the confidentiality of communications with patent agents is governed by statute which this court is obliged to honor under the rule of comity.

Although no attorney-client privilege can attach to communications with foreign patent agents relating to the development of trial preparation materials for litigation in the United States or for litigation in Great Britain before 1968, or for litigation in France before 1965, such communications may nevertheless be protected by the work product privilege. Both American and foreign patent agents will be considered as representatives of a party capable of generating privileged trial preparation materials protectable under Federal Rule of Civil Procedure 26(b)(3).

The guidelines laid down in this part of this order shall apply to communications with the following foreign patent agents and their corporate clients:

France: Beau deLomenie (Chavanoz), Chereau (Chavanoz), Laurent (ARCT–France, Chavanoz), Morel (Chavanoz), Prud'Homme (Chavanoz), Rosset (Chavanoz), Soep (Chavanoz and ARCT–France) [see 370 F.Supp. 761 (D.S.C. 1972)], Vuillermoz (Chavanoz).

Great Britain: Allen (Chavanoz), Cannon (Chavanoz), Dunlop (Chavanoz), Lingwood (Chavanoz).

■■■ Therefore, Chavanoz and ARCT–France shall produce the following communications between any of these foreign patent agents and either Chavanoz or ARCT–France or both:

(1) communications the subject of which is any United States patent, except when giving advice to client's counsel in the preparation and/or conduct of litigation before courts of record, or when acting in a foreign country in a capacity equal to patent house counsel in the United States;

(2) communications the subject of which is any United States patent application;

(3) communications originating from or sent to any French patent agent before the enactment of Article 378 of the French Penal Code or any British patent agent before the enactment of § 15(1) of the British Civil Evidence Act, relating to a French or British patent application;

(4) communications the subject of which is any licensing agreement with any United States person, firm or corporation;

(5) any communication which was published or sent to any third party in the United States; and

(6) communications concerning any conference in the United States, except where trade secrets are involved.

## V

■ Communications made *after* the fact of the commission of a crime, fraud, or tort between an attorney and persons within the control group of the corporate client are protected by the attorney-client privilege. Indeed, the main purpose for the creation of the attorney-client privilege is to allow just such communications to be made in the interest of establishing a legal defense. Extensive citation of case law is unnecessary. See Annot., 16 A.L.R.3d 1029 (1967).

Communications made *before* the fact of or *during* the commission of a crime, fraud, or tort between an attorney and persons within the control group of the corporate client are *not* protected by the attorney-client privilege. To allow the attorney-client privilege to attach for such communications would permit an attorney to be a principal or an accessory to a crime, fraud, or tort without fear of discovery and would permit clients to commit crimes, frauds, and torts with the aid of legal advice beforehand. Consultation to carry out the wrongful conduct is a conspiracy. The attorney-client privilege was not meant to protect such communications intended to foster criminal, fraudulent, or tortious conduct. Union Camp Corp. v. Lewis, 385 F.2d 143 (4th Cir. 1967); United States v. Bob, 106 F.2d 37 (2d Cir. 1939), cert. denied, 308 U.S. 589, 60 S.Ct. 115, 84 L.Ed. 493; Annot., 2 A.L. R.3d 861 (1965).

■ Although there are no crimes charged in this case, frauds on the Patent Office and business torts in the form of antitrust violations are alleged. In order for the attorney-client privilege not to apply to communications made before or during the commission of a crime, fraud, or tort, there must be only a prima facie showing that the lawyer's advice was designed to serve his client in the furtherance of its wrongful conduct. *Union Camp Corp.*, supra, at 144; United States v. Bob, supra, 106 F.2d at 40; Clark v. United States, 289 U.S. 1, 15, 53 S.Ct. 465, 77 L.Ed. 993 (1933) (dictum).

## VI

■ A community of interest exists among different persons or separate corporations where they have an identical legal interest with respect to the subject matter of a communication between an attorney and a client concerning legal advice. The third parties receiving copies of the communication and claiming a community of interest may be distinct legal entities from the client receiving the legal advice and may be a non-party to any anticipated or pending litigation. The key consideration is that the nature of the interest be identical, not similar, and be legal, not solely commercial. The fact that there may be an overlap of a commercial and a legal interest for a third party does not negate the effect of the legal interest in establishing a community of interest.

■ The sharing of information between counsel for parties having common interests does not destroy the work product privilege, during the course of the litigation. Transmirra Products Corp. v. Monsanto Chemical Co., 26 F. R.D. 572, 578 (S.D.N.Y.1960).

It is not so clear however that the attorney-client privilege can survive such an interchange. In Rediker v. Warfield, 11 F.R.D. 125, 127 (S.D.N.Y.1951), the court observed:

Since [an] attorney and client relationship did not exist between the attorneys representing their respective clients, the conversations and communications are not privileged.

This same reasoning was followed in Radio Corporation of America v. Rauland Corp., 18 F.R.D. 440 (N.D.Ill.1955), a patent infringement action, in which

certain documents were being withheld on the basis of the attorney-client privilege. Among these were some described as "communications to and from directors, officers or employees of RCA and the Legal Departments of General Electric, Westinghouse, American Telephone and Telegraph Company, and others" The court citing *Rediker*, supra, there observed:

> . . . it is sufficient to say that the attorney-client privilege does not extend to communications between directors, officers, or agents of different corporations, or to negotiations between such corporations which are made or conducted by men who happen to be members of the bar. Neither does it extend to communications made by a client to his attorney with the understanding that the information is to be imparted to a third party. (Citations omitted.)

To hold otherwise would lead to the ridiculous result that conspiracies formed and conducted by lawyers on behalf of corporations would be beyond the reach of the law. The attorney-client privilege is narrow.

\* \* \* \* \* \*

As to the documents with respect to which the attorney-client privilege has been waived by disclosure to any other person, or where the attorney was acting in the capacity of negotiator, or in any capacity other than advising a client on legal matters, the documents will be produced to cross-claimants. *Rauland*, supra, at 443, 444.

In United States v. Tellier, 255 F.2d 441 (2d Cir. 1958), the court was faced with the question of whether the fact that an attorney representing a securities firm, in addition to advising his client on a legal question, made copies of a letter prepared for his client (with his client's knowledge) for a company represented by his client, constitutes a waiver of the attorney-client privilege. The court, in concluding that the attorney-client privilege was waived, observed:

It is of the essence of the attorney-client privilege that it is limited to those communications which are intended to be confidential. "The moment confidence ceases," said Lord Eldon, "privilege ceases." Parkhurst v. Lowten, 2 Swanst. 194, 216 (1819). Consult 8 Wigmore on Evidence §§ 2311–2316 (3rd ed. 1940). Thus it is well established that communications between an attorney and his client, though made privately, are not privileged if it was understood that the information communicated in the conversation was to be conveyed to others. *Id.* at 447. (Citations omitted.)

It must be noted that in the above cases the courts were not directly faced with the question presented this court, that is, when does the interchange of communications between separate corporations, in the preparation and conduct of litigation to which the corporations were parties on the same side, waive the attorney-client privilege.

A case which specifically reaches this question is *Transmirra*, supra. In that case however, the court's discussion is dicta because, first, the court did not pass on the question, the question not being raised by the parties, and, second, the issue of waiver was decided on the basis of the work product privilege. In *Transmirra*, supra, at 576–577, the court stated:

> An examination of the few cases dealing directly with the question of privilege based upon the attorney-client relationship would seem to indicate that persons represented by different attorneys but conducting a "joint defense" may pool information without waiving this privilege.

\* \* \* \* \* \*

A more restrictive interpretation of the attorney-client privilege may be found in Rediker v. Warfield, D.C.S. D.N.Y.1951, 11 F.R.D. 125, 127, and Radio Corporation of America v. Rauland Corp., D.C.N.D.Ill.E.D.1955, 18 F. R.D. 440, 443.

In any event, this court is not required to pass here on the precise issue of a possible attorney-client privilege, for defendant has neither proffered nor pressed its objections on this specific basis. (Citations omitted.)

It is noteworthy also, that in *Transmirra* each of the cited cases involved parties involved in conducting a *joint defense* or were jointly indicted. None of the cases cited therein involved the sharing of information, for which an attorney-client privilege was claimed, with individuals or corporations not parties to the action.

■ Plaintiff urges that when two or more persons, each having an interest in some problem or situation, jointly consult an attorney, their confidential communications with the attorney, though known to each other, remain privileged as to outsiders and cite the following quote from McCormick, Evidence § 91, at 190–91 (2d ed. 1972):

[W]here two parties separately interested in some contract or undertaking as in the case of borrower and lender or insurer and insured, engage the same attorney to represent their respective interests, and each communicates separately with the attorney about some phase of the common transaction . . . [h]ere again it seems that the communicating client, knowing that the attorney represents the other party also, would not ordinarily intend that the facts communicated should be kept secret from him. Accordingly, the doctrine of limited confidentiality has been applied to communications by the insured under a liability insurance policy to the attorney employed by the insurance company to represent both the company and the insured. A confidential statement made by the insured through the attorney, or to the insurer for use of the attorney, would thus be privileged if sought to be introduced at the trial of the injured person's action against the insured, but not in a controversy between the insured, or one claiming under him, and the company itself over the company's liability under the policy.

This point is also covered in 8 Wigmore, Evidence § 2312 (McNaughton rev. 1961) in considerable detail. Professor Wigmore states:

Communications to opponent or his attorney or in opponent's presence; Joint attorney. There may be a relative, not an absolute, confidence.

The chief instance occurs when the *same attorney acts for two parties* having a common interest, and each party communicates with him. Here the communications are clearly privileged from disclosure at the instance of a third person. Yet they are not privileged in a controversy between the two original parties, inasmuch as the common interest and employment forbade concealment by either from the other. On the other hand, a communication to the *opposing party's* attorney, as such, is clearly without the privilege, since no confidence is reposed nor, if reposed, could be accepted.

But between these two extremes occur a number of situations shading into each other. It is necessary to examine these situations separately with their respective solutions. (Emphasis in original.)

A careful reading of both McCormick and Wigmore clearly establishes that the confidence (privilege) is relative, not absolute; the common attorney is acting for the two parties; and each situation must be examined separately.

■ With regard to the third point, a careful reading of the examples given by the two leading authorities brings out the fact that the key consideration here is the *nature of the common interest* as it relates to the action of the attorney. As pointed out by McCormick, the principle has been applied in insurance liability cases to protect disclosures by the client to either the insurer or the

attorney provided by the insurer for the client's defense. Similarly, Wigmore gives examples of the privilege being sustained against outsiders in cases of partnerships and land conveyancings where the attorney represented both parties. (Wigmore § 2312, nn. 1 & 3). All of these examples involve either a duty owed to client C by client B which necessitates B being advised of communications between C and the attorney, or A *direct transaction between B and C* which necessitates the services of an attorney who represents the interests of both parties to the transaction. The above rule and its examples however are exceptions to the normal rule that the communications to a third party, of an otherwise privileged exchange between attorney and client, constitute a waiver of the privilege. Where the communication to a third party (non-party client), of an attorney-client exchange is not based on such a duty or direct transaction between the joint clients of an attorney (that is, a legal interest), but is based rather on the non-party client's interest in a matter involving the prime client and some outsider, the reason for the exception to the normal rule of waiver ceases to exist, and with it, the exception. This is so even though the communication is with the full knowledge and consent of the prime client, and even though the non-party client, of the same attorney is actively assisting the prime client in his adversary action. The underlying reason here is as basic as the purpose of the attorney-client privilege itself, which, as stated by Wigmore, is that:

> The privilege is designed to secure objective freedom of mind for the *client* in seeking legal advice (ante, sec. 2291). It has no concern with other persons' freedom of mind, nor with the attorney's own desire for secrecy in his conduct of a client's case. It is therefore not sufficient for the attorney, in invoking the privilege, to state that the information came somehow to him while acting for the client, nor that it came from some particular

> *third person* for the benefit of the client. (Emphasis in original.)

Thus, where there is no legal interest (duty or direct transaction between the two clients of the attorney), the mere interest of a non-party client in legal transactions between the prime client and an outsider is not sufficient to prevent a waiver of the attorney-client privilege. This is true no matter how commercially strong the non-party client's interest is, or how severely the non-party client may be legally effected by the outcome of the transaction between the prime client and an outsider.

### Present Litigation

 As to the present litigation, there is a sufficient community of interest between Rhodiaceta, Chavanoz, ARCT–France, ARCT, Inc., DMRC, and DMI so that there is no waiver of the attorney-client privilege of communications made between the parties. Rhodiaceta, although not a party to this litigation, has a duty to act through its patent department in DAPID as legal patent advisor to Chavanoz and ARCT–France. Thus, there is no waiver of the attorney-client privilege because communications were made to or received from Rhodiaceta. Whitin, although not a party to this litigation, is interested in this litigation from a commercial standpoint because it was the exclusive United States sales-licensee under the patents in suit. Chavanoz, as the owner of the patents in suit, had a duty to defend Whitin but this litigation does not call for an exercise of that duty. Therefore, Whitin does not have a sufficient community of interest with the parties mentioned above so that, for any communication made among those parties and for which an attorney-client privilege is claimed, there is a waiver of the privilege if the communication was sent to Whitin. Of course, the work product privilege may attach for communications made to or received from Whitin for the purpose of gathering evidence during the course of this litigation.

### Current Litigation in Great Britain

■ (1) As to the current litigation entitled Scragg v. Maystock in Great Britain brought by Scragg against Maystock on British Patent No. 850,693, there is sufficient community of interest between Rhodiaceta, Chavanoz, ARCT–France, and Maystock so that there is no waiver of the attorney-client privilege for communications made among these parties, even though Rhodiaceta, Chavanoz, and ARCT–France are not parties to the litigation. Maystock, a British customer of ARCT–France, is being sued by Scragg for patent infringement. Chavanoz, as owner of the British patents under which Maystock is licensed, has a duty to defend Maystock and therefore there is no waiver of the attorney-client privilege because communications were made to or received from any of the above non-parties.

■ (2) As to the current litigation entitled ARCT–France v. Scragg in Great Britain brought by ARCT–France against Scragg for revocation of British Patent No. 850,693, there is sufficient community of interest from both a commercial and legal standpoint among Rhodiaceta (as legal patent advisor), Chavanoz (as a competing patent owner) and ARCT–France (as exclusive manufacturing licensee under the competing patents), so that there is no waiver of the attorney-client privilege for communications made among these parties, even though Rhodiaceta and Chavanoz are not parties to the litigation.

(3) As to the current litigation entitled Chavanoz v. Seem and Stoddard in Great Britain brought by Chavanoz against Lex-Tex over British Patent No. 890,331, there is sufficient community of interest among Rhodiaceta (as legal patent advisor), Chavanoz (as a competitor and as a party to the suit), and ARCT–France (as exclusive manufacturing licensee under the competing patents), so that there is no waiver of the attorney-client privilege for communications made among these parties.

### Terminated Litigation against Leesona in Brooklyn

■ As to the terminated litigation in the Eastern District of New York brought by DMRC against Leesona, there was a sufficient community of interest among Rhodiaceta (as legal patent advisor), Chavanoz (as patent owner with a duty to defend its licensees), and DMRC (as exclusive United States use-licensee and as a party to the suit), so that there was no waiver of the attorney-client privilege for communications made among these parties. ARCT–France and Whitin, although not parties to the litigation, were interested in that litigation from both a commercial and legal standpoint because ARCT–France is the exclusive United States manufacturing licensee and Whitin was the exclusive United States sales-licensee, under the patents in suit. This establishes a sufficient community of interest with the parties mentioned above so that for any communication made among those parties and for which an attorney-client privilege is claimed, there is no waiver of the privilege if the communication was sent to ARCT–France or Whitin.

### Schwarzenbach-Huber Arbitration

■ As to the stayed arbitration proceeding between Leesona and Schwarzenbach-Huber, there was a sufficient community of interest between DMRC (as exclusive United States use-licensee with a duty to defend its sub-licensees) and Schwarzenbach-Huber (as a sub-licensee and a party to the suit). There was a waiver of the attorney-client privilege of communications made between these parties by the attacked sub-licensee, Schwarzenbach-Huber, in open court, the parties now being on opposite sides in this litigation. Chavanoz (as owner of the patents not involved in the arbitration but under which Schwarzenbach-Huber was licensed), ARCT–France (as exclusive United States manufacturing licensee), and Whitin (as exclusive United States sales-licensee),

were interested in the arbitration from both a commercial and a legal standpoint. Although there was no direct duty on the part of these firms to Schwarzenbach-Huber, they did have a sufficient community of interest with DMRC so that any communication not sent to Schwarzenbach-Huber but made by or to DMRC concerning the litigation and for which an attorney-client privilege is claimed, is not waived if the communication was sent to Chavanoz, ARCT–France, or Whitin.

The affidavit of Granville M. Brumbaugh, Sr., Esquire, May 10, 1974, ¶ 25, states that he represented only DMRC in this arbitration proceeding and at no time during its pendency did Chavanoz, ARCT–France, DMRC, or Whitin retain common counsel with Schwarzenbach-Huber. As a result, DMRC and its allied parties had a right to communicate in confidence with each other and with their own attorneys, who did not represent Schwarzenbach-Huber.

*Settled Litigation against Leesona in Massachusetts and South Carolina*

As to the terminated litigation in the District of Massachusetts known as Whitin v. Leesona and in the Western District of South Carolina known as Leesona v. Cotwool, consolidated in the former district and settled out of court in 1964, there was a sufficient community of legal interest among Rhodiaceta (as legal patent advisor), Chavanoz (as patent owner with a duty to defend its licensees), Whitin (as exclusive United States sales-licensee and a party to the Boston suit), DMRC (as exclusive United States use-licensee and a party to the South Carolina suit), and Cotwool (as a sub-licensee and as a party to the South Carolina suit). ARCT–France, although not a party to the litigation, was again interested in these lawsuits from both a commercial and legal standpoint as exclusive United States manufacturing licensee. This establishes a sufficient community of interest with

the parties mentioned above so that any communication made among those parties and for which an attorney-client privilege is claimed, there is no waiver of the privilege if the communication was sent to ARCT–France.

The throwsters raise the argument that although there may be an actual community of legal interest among Rhodiaceta, Chavanoz, Whitin, DMRC, and Cotwool (now DMI) in that litigation, a judicial estoppel arises against that assertion in this court because of affidavits filed by Armitage, as Vice President of DMRC, and Brumbaugh, as attorney for Whitin, in the Whitin v. Leesona lawsuit in the District of Massachusetts; a similar affidavit filed by Armitage, a deposition taken from Bolton, and a Memorandum in Support of Defendant's Motion to Stay Proceedings, submitted to the court by Poag, as attorney for Cotwool, in the Leesona v. Cotwool lawsuit in the Western District of South Carolina.

That an estoppel can arise because of a prior inconsistent claim or position taken in a judicial proceeding is clear. A party cannot have its cake and eat it too. Although there are several species of estoppel, the court is here dealing with what is generally known as judicial estoppel or the doctrine of preclusion against inconsistent positions. This type of estoppel protects interests different from those protected by equitable estoppel, the type referred to in 31 C.J.S. Estoppel § 117a (1964), and relied upon by plaintiff in its effort to avoid any estoppel effect. Equitable estoppel is designed to protect any adversary who may be prejudiced by the attempted change of position. On the other hand, judicial estoppel, or preclusion against inconsistent positions, is designed to protect the integrity of the courts and the judicial process.

An exposition of the modern doctrine of judicial estoppel based upon preclusion against inconsistent positions is found in 1B Moore, Federal Practice,

¶ 0.405[8], at 765–768 (2d ed. 1971) as follows:

> Even where the facts will not permit the application of res judicata, collateral estoppel, or the election rule against inconsistent remedies, a party may be precluded by a prior position taken in litigation from later adopting an inconsistent position in the course of a judicial proceeding. Though the preclusion doctrine is sometimes referred to as "judicial estoppel" or "estoppel by oath," and though it is frequently expressed in language sounding of estoppel in pais, numerous cases illustrate the existence of a doctrine forbidding inconsistent positions, usually as to facts, which operates independently of equitable estoppel.
>
> Many cases forbidding inconsistent positions in judicial proceedings may be grouped conveniently into two classes: those where a party seeks to contradict his own sworn statements made in prior litigation in which he was a party or a witness; and those where the prior inconsistent position was not taken under oath. . . .
> Both types of preclusion seem to fall, generically, within a universal judicial reluctance to permit litigants to 'play fast and loose' with courts of justice according to the vicissitudes of self-interest.
>
> \* \* \* \* \* \*
>
> The preclusion rule has been held to operate regardless of whether the prior inconsistent position was successfully maintained; and irrespective of reliance by, or prejudice to, the party invoking it. Strangers, as well as parties to the proceeding in which the prior inconsistent position was taken, may take advantage of the preclusion. (Citations omitted.)

There is numerous case law authority for the result reached herein. In Hurd v. DiMento & Sullivan, 440 F.2d 1322 (1st Cir. 1971) plaintiff brought suit against a firm of attorneys for breach of an agreement to represent her in an earlier action. In dismissing the suit for failure to state a claim upon which relief could be granted, the court relied upon a letter written by plaintiff to the court in the earlier action seeking continuance:

> On March 28, 1969, plaintiff consulted Attorney Francis J. DiMento, who, because of other commitments, was unable to represent the plaintiff, but who undertook to obtain other counsel for her. To date, Attorney DiMento has inquired of twelve (12) attorneys, including one recommended by the Lawyers' Referral Service of the Boston Bar Association.

In affirming the district court, the First Circuit invoked an estoppel in favor of the law firm who were strangers to the earlier action:

> Hence, in making this statement as part of her complaint in the instant case, plaintiff is estopped from now claiming that defendants had agreed to represent her. 440 F.2d at 1323.

Judicial estoppel which precludes a party or witness from taking inconsistent positions in judicial proceedings was enunciated in Scarano v. Central R. Co. of N. J., 203 F.2d 510, 512–513 (3d Cir. 1953), as follows:

> Such use of inconsistent positions would most flagrantly exemplify that playing 'fast and loose with the courts' which has been emphasized as an evil the courts should not tolerate. And this is more than affront to judicial dignity. For intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice. (Citation omitted.)

Similarly, in Yeo v. Cohen, 6 F.2d 411 (D.Mass.1925), the court said:

> It is well settled that a party who falsely testified to a fictitious state of facts for his own benefit will not, when his interest changes, be heard to say what the facts really were.

The Supreme Court has alluded to this proposition. The doctrine is not unlike

that expressed in the basic principle that "he who comes to equity must come with clean hands." As stated by the Supreme Court in Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 244–245, 54 S.Ct. 146, 147, 78 L.Ed. 293 (1933):

> The governing principle is "that whenever a party who, as *actor*, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him in limine; the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy. (Citation omitted; emphasis in original.)

In Hazel-Atlas Co. v. Hartford-Empire Co., 322 U.S. 238, 246, 64 S.Ct. 997, 1001, 88 L.Ed. 1250 (1944), while acknowledging that it was wholly impossible accurately to appraise the influence of the false representation there involved, the Supreme Court stated:

> [T]ampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.

■ This court accepts the general rule of judicial estoppel based upon preclusion against inconsistent positions as stated in 1B Moore, Federal Practice, ¶ 0.405 [8], supra, but finds that it is not applicable here. Parties cannot deny a community of legal interest during the course of one litigation for the sake of obtaining a strategic advantage and later, in another litigation, assert a community of legal interest claim for the terminated litigation for the sake of protecting communications under the attorney-client and work product privileges. However, that is not what has happened here.

■ The fact as to who controlled the earlier litigation was apparently misrepresented in an effort to persuade the court to concentrate the actions in the district of the alleged controlling party, Whitin, and not in the district of the actual controlling parties, DMRC and Chavanoz. This misrepresentation of fact was apparently deliberately made on the part of Armitage, and perhaps unwittingly made on the part of Bolton and the attorneys Brumbaugh and Poag.

Although there was a clear misrepresentation of fact on the issue of control, it does not constitute an estoppel on the issue of community of interest for attorney-client communications, since plaintiff has always maintained that such a community of legal interest existed.

In the earlier litigation, Leesona owned patents on false twist technology. It manufactured and sold its own machinery. Cotwool was a sublicensee of Chavanoz, the owner of competing patents in the area. Leesona filed a lawsuit against Cotwool in the United States District Court for the Western District of South Carolina on April 1, 1960. On April 4, 1960, Armitage, the Vice President of DMRC, sent a letter to Leo Soep, a French patent agent acting on behalf of Chavanoz, both men now being deceased. This letter, Exhibit No. 415,[9] states:

> As I see it, it would be much better to have the suit up in the First Circuit,

---

9. This exhibit, as others referred to herein were placed in the record of the present case and were marked by the Deputy Clerk of Court during the course of approximately 85 live depositions lasting over a continuous period of 2½ years. Almost 2,100 such exhibits were introduced.

which includes both Rhode Island and Massachusetts, instead of down here in [sic] reasons why New England would be better. On the other hand, a suit down here will probably come to trial considerably sooner than would a suit in the First Circuit, and this should be a real advantage to us.

This matter has not been discussed with our attorneys because Granville is out of town for a couple of weeks. I am sending him a copy of this letter and I imagine that Jim Buckner will see it and will be ready for anything which may eventuate.

This letter demonstrates the participation of DMRC in the decision to file the Whitin v. Leesona lawsuit later.

Exhibit No. 1598,[10] a reply letter dated April 8, 1960, from Soep to Armitage states:

However, please note that if Granville [Brumbaugh] agrees to it, we can start immediately a declaratory judgment action. What about having this done by Whitin, independantly [sic], in R.I. or Mass.

Thereafter, on April 22, 1960, Armitage and Waters, as Sales Manager of Whitin, discussed the matter referred to in Exhibit No. 1598, as to the institution of the lawsuit and as to a proposed announcement to be made to the trade. As to the institution of the lawsuit, Armitage wrote a letter dated May 2, 1960, to Soep. Exhibit No. 418,[11] states:

As I understand the agreement between us, we are sharing in the counsel fees and court costs which we have undertaken in the sublicenses to pay on behalf of our licensees or of Whitin Machine Works standing in the place of such sublicensee.

This exhibit demonstrates that ultimate control did not lie with Whitin. Armi-

tage testified to such effect in this litigation. Armitage deposition, Vol. IV–A, p. 305. As to the announcement to the trade, Armitage's memo to Milliken, dated May 5, 1960, is further proof of DMRC's paramount role in the later institution of the Whitin v. Leesona lawsuit. Exhibit No. 190,[12] states:

Attached is a copy of the second draft of the proposed advertisement about the Leesona-Judson litigation. As you will see, it is based upon our intention of filing a declaratory judgment action against Leesona at a date prior to the opening of the Atlantic City [Textile] Show.

Subsequently, Whitin filed a declaratory judgment action entitled Whitin Machine Works v. Leesona Corp., Civil Action No. 60–313–F, in the United States District Court for the District of Massachusetts on May 11, 1960. Shortly thereafter, it was DMRC, not Whitin, which authored the announcement placed in the textile trade press. See Armitage deposition, Vol. VI–A, p. 308. The announcement explained the institution of the lawsuit in Massachusetts. Exhibits Nos. 31 and 32.[13] It bore the signatures of both Bolton, Sr., as President of Whitin, and Milliken, as Chairman of the Board of DMRC. DMI then moved for a stay of the proceedings in South Carolina and Whitin moved to add DMRC and DMI as parties plaintiff in Massachusetts. The motions were at first denied but eventually they were granted in order to bring all interested parties into one action in a proper and convenient forum.

In support of their motion, Poag, as attorney for Cotwool, filed a Memorandum in Support of Defendant's Motion to Stay Proceedings on August 4, 1960 in the South Carolina District Court.

10. Ibid.

11. Ibid.

12. Ibid.

13. Ibid.

This memorandum, introduced as Exhibit No. 2083,[14] states:

As is clear from the Bolton deposition [15]

(pp. 8, 9 and 15), the Massachusetts action was begun *entirely* upon the initiation of Whitin in order to protect its rights and *none of Derring Milliken, Cotwool or Chavanoz has any connection with the Massachusetts* case. (Emphasis added.)

Several affidavits were introduced in support of this memorandum. Exhibit No. 2084 [16] is a copy of the affidavit filed by Bolton, Jr., as Vice President of Whitin, docketed August 15, 1960, in the District of Massachusetts. It states:

There is no agreement between Deering Milliken and Whitin. Indeed, the only relationship between these two companies is that they are licensed under the same patent rights.

* * * * * *

Whitin, who has the primary interest in this controversy, instituted this action upon its own initiative without consultation with Deering Milliken. Whitin has full control of the litigation and desires a prompt and complete adjudication.

Exhibit No. 1181 [17] is a copy of the affidavit filed by Brumbaugh, docketed August 19, 1960, in the District of Massachusetts. Brumbaugh, as attorney for Whitin, stated:

. . . . There is no agreement or relationship between Research and Whitin except that they are licensed under the same patent rights owned by Chavanoz.

* * * * * *

. . . . Since the infringement suit in South Carolina questions Whitin's right to manufacture and to continue selling the FT machines, Whitin, on its own initiative, instituted this declaratory judgment action with respect to the same patents of Leesona, alleged by Leesona to be infringed in the South Carolina case to establish its rights with respect to the FT machines. Research did not in any way participate in the decision to institute this action, and Whitin presently has the sole control of the prosecution of the proceedings herein.

This affidavit was filed apparently to convince the Massachusetts District Court that DMRC and DMI should be added as parties plaintiff.

Exhibit No. 421 [18] is a copy of two different affidavits filed by Armitage, one docketed August 16, 1960 in the District of Massachusetts and the other docketed August 19, 1960 in the Western

14. Ibid.

15. Bolton deposition, at 8–9, states:
Q. Were there any discussions between your Company and Deering-Milliken Research Corp. prior to the filing of that action by Whitin, regarding the possibility of filing the action?
A. Yes.
Q. With whom did you have those discussions?
A. Informal discussions with Dr. Armitage.
Q. What was the substance of the discussions?
A. We merely informed Dr. Armitage of the action we were going to take so that he would be fully informed on all matters pertaining to this case.
Q. Did you discuss with him whether or not you should file this declaratory action or whether the action should be taken by Deering-Milliken Research Corp.?

A. No.
Q. Were there any discussions of this prospective action against Lessona Corporation between your own Company and Deering-Milliken Research Corp. prior to the time that you notified Dr. Armitage that you were planning to file this suit?
A. Prior to the time we notified Dr. Armitage?
Q. That is right.
A. Not to my knowledge.
Q. Would you normally, because of your position in the Company, know of such a discussion if any had occurred?
A. I should.

16. See note 9, supra.

17. Ibid.

18. Ibid.

District of South Carolina. Armitage stated in the Massachusetts affidavit:

. . . [T]he only relationship between Whitin and Research Corporation [DMRC] is that they are licensed under the same patents owned by Chavanoz.

\* \* \* \* \* \*

. . . . A Research Corporation did not participate in Whitin's decision to institute this action. Moreover, Research Corporation has not participated in any proceedings in this action and does not have an agreement with Whitin which would entitle it to participate in this action. I believe that Whitin instituted this suit on its own initiative and it has the exclusive right to control all proceedings herein.

This affidavit was filed also apparently to convince the Massachusetts District Court that DMRC and DMI should be added as parties plaintiff. His South Carolina affidavit states:

I also understand that Plaintiff [Leesona] has filed a motion to add Research and Whitin as parties defendant in this action. Research strongly opposes this motion on the ground that it is not subject to the jurisdiction of this Court because of the venue statutes applicable to patent infringement actions. Research has not committed any acts of infringement in this Western District of South Carolina or elsewhere.

. . . . Research did not in any way participate in the decision to institute the declaratory judgment action in Massachusetts and has not as yet participated in any proceeding in that action. I believe that Whitin instituted the Massachusetts action on its own initiative and has the exclusive right to control the prosecution of that action. However, in view of the recent charges by Plaintiff that the licensing activities of Research infringe Plaintiff's patents, Research Con-

curred [sic] in a motion by Whitin to add Research as a party plaintiff in the Massachusetts action.

This affidavit was filed apparently to convince the South Carolina District Court that the Leesona v. Cotwool lawsuit should be transferred to the District of Massachusetts, or, at least, be stayed until the outcome of the Whitin v. Leesona lawsuit.

Soep puts to rest whatever doubts there could possibly be about the Massachusetts litigation in Exhibit No. 846.[19] At oral argument, counsel for plaintiff attempted to explain away Exhibit No. 846 as mere wishful thinking on Soep's part. On the contrary, the document accurately reflects the *modus operandi* of that litigation, neatly summarizing the totality of the evidence on the subject. Exhibit No. 846, a letter dated October 16, 1961 from Soep to Henri Crouzet, as Chairman of the Board of Directors of ARCT–France, states:

It is as a consequence of this liability that Chavanoz and DMRC undertook the defense of Judson Mills and filed counter-attack against Leesona, having Whitin act for them in the counter-attack for tactical reasons, Whitin not paying any costs at all.

The above quoted materials concede a community of commercial and legal interest. The documentary evidence in the record in this case overwhelmingly supports the conclusion that the affidavits (Exhibit Nos. 421, 1181, and 2084), the deposition and memorandum (Exhibit No. 2083) clearly contain misrepresentations of fact with respect to the institution, control, and conduct of the two litigations.

It is obviously true that the Massachusetts suit was filed by Whitin. In the quite limited sense that it was the attorney of record for Whitin who physically had to sign and file the papers, it can be said that Whitin itself made the decision to go ahead (instead of, for ex-

19. Ibid.

ample, refusing to file the suit).[20] But, contrary to what this court is being asked to find, decisions are not made in a vacuum. In the context of the contemporaneous documentary evidence, the only reasonable and logical inference is that DMRC and Chavanoz did participate, indeed, instigate, the bringing of the suit, contrary to the deposition, memorandum, and affidavits. Likewise, there is no merit to any argument to the effect that because Whitin had to implement any decisions made, it had sole control of the litigation. Chavanoz, not a party to the litigation but working behind the scenes, controlled the litigation. It is only common sense that Chavanoz, as a patent owner, was not about to risk the conduct of the litigation against its chief competing patent owner in the hands of a mere licensee. Chavanoz and DMRC directed the litigation and paid the bills. The one who pays the piper usually calls the tune.

Exhibit Nos. 415, 1598, 418, and 190 set forth the true state of affairs with respect to bringing the Massachusetts suit and completely rebut the affidavits, deposition, and memorandum. The truth is obvious from Exhibit Nos. 415, 1598, 418, and 190 that Chavanoz and DMRC *did* have an agreement with Whitin which would entitle it to participate in the Massachusetts action, that Whitin *did not* institute the Massachusetts suit on its own initiative, but on the suggestion of Chavanoz, and *did not* have the exclusive right to control that litigation, contrary to the portions quoted above from Exhibit Nos. 1181, 421, 2083, and 2084. The quoted portions of the Armitage and Brumbaugh affidavits filed in Massachusetts admit a community of commercial and legal interest among Chavanoz, Whitin, DMRC, and DMI. The Armitage affidavit, the Bolton deposition, and the Poag memorandum filed in South Carolina also tend to admit a community of commercial and legal interest among the enumerated parties.

Plaintiff (Chavanoz, DMRC, and DMI) in this court now assert a community of legal interest in the terminated litigation for communications among them.

In the prior litigation, the associates asserted a community of legal interest to achieve tactical advantages, that is, forum shopping to insure that the validity of Leesona's patents would be litigated in Massachusetts. In spite of the fact that they initially suffered a setback in this objective (losing a motion to add parties in Massachusetts and unsuccessfully resisting similar attempts in South Carolina), they eventually succeeded in focusing the entire litigation in Massachusetts. The South Carolina action as to Whitin was transferred and as to DMRC and Cotwool was stayed. The affidavits, deposition, and memorandum misled this court 14 years ago and the Court of Appeals for the Fourth Circuit which affirmed the transfer order. The Court of Appeals, speaking through Circuit Judge (now Chief Judge) Haynsworth, was induced to agree with the district court that "the principal contestants are the manufacturer-vendors of competing machinery" and that "the burden of the defense and of the production of evidence rest upon Whitin rather than upon Deering Milliken and Cotwool." Therefore, "We cannot say that the District Court's determination that its [Whitin's] interest *was primary* was an abuse of the discretion vested in it." Leesona Corp. v. Cotwool Mfg. Corp., 308 F.2d 895, 898 (4th Cir. 1962). (Emphasis added.)

In view of this compelling evidence, the only conclusion possible is that, in the earlier litigation, plaintiff was playing "fast and loose with the courts", in misrepresenting to the court who actually controlled the now terminated lawsuits. This court cannot condone such conduct but the issue before the court now is different—community of legal interest for privileged documents. There actually existed a community of legal in-

---

20. When being interrogated with regard to his affidavit, Armitage was reduced to a similar assertion. Armitage deposition, Vol. VI–A, p. 320.

terest between Chavanoz, Whitin, DMRC, and DMI. The parties to the earlier litigation continually asserted a community of commercial and legal interest in order to be joined as parties in the District of Massachusetts and to have the lawsuit in the Western District of South Carolina transferred or stayed. A judicial estoppel would arise if the parties were trying to be dropped as parties. The misrepresentations made by the affidavits, deposition and memorandum went to the issue of control. This will not be held to constitute an estoppel by a prior inconsistent position in a judicial proceeding against the assertion of the community of legal interest claim for communications among the parties for which attorney-client and work product privileges are claimed. Therefore, any communication made among control group members of a corporation, their representatives, and attorneys for the corporate client will be considered to remain privileged if the communication was relayed to any one of the other parties in the Leesona v. Cotwool or Whitin v. Leesona lawsuits, as well as to the non-party patent owner, Chavanoz.

### Terminated Foreign Litigation

There have been numerous lawsuits, now terminated, involving Chavanoz (as the owner of foreign patents), and ARCT–France (as the exclusive foreign manufacturing licensee), in France and Great Britain. There is a sufficient community of interest among Rhodiaceta (as legal patent advisor), Chavanoz (as patent owner with a duty to defend its licensees), ARCT–France (as exclusive foreign manufacturing licensee), and, where applicable, the individual sublicensees being sued by third parties in the various lawsuits, so that there was no waiver of the attorney-client privilege of communications made between these parties. These lawsuits were the following:

In France: Chavanoz v. Klinger; Chavanoz v. Plantevin and Klinger; Chavanoz v. LaLainiere and Leesona; Chavanoz v. Bonneterie Cevenole and Scragg; Chavanoz v. Manivet; ARCT–France v. Universal Winding; Universal Winding v. ARCT–France and Pont de-Bridou.

In Great Britain: Chavanoz v. Klinger; Chavanoz v. Scragg and Debonair; Heberlein and Fluflon v. Qualitex and Chavanoz.

As to all these lawsuits, especially Heberlein and Fluflon v. Qualitex and Chavanoz, communications with opposing parties to a litigation are clearly not privileged "since no confidence is reposed nor, if reposed, could be accepted". 8 Wigmore, Evidence § 2312 (McNaughton rev. 1961). Therefore, to the extent privileged documents record or reflect the substance of such communications with opposing parties they are, at least to that extent, not privileged. See Hanover Shoe, Inc. v. United Shoe Machinery Corp., 207 F.Supp. 407 (M.D.Pa. 1962).

Rhone-Poulenc textiles (affiliate of Chavanoz), Rhodiaceta (affiliate of Chavanoz), Rhodia, Inc. (affiliate of Chavanoz), Celtex S.A. (affiliate of Chavanoz), CTA (affiliate of Chavanoz) and Ronget (subsidiary of Chavanoz) were interested in the lawsuits involving Chavanoz. MAFO (sales subsidiary of ARCT–France) and ACBF (manufacturing subsidiary of ARCT–France) were interested in the lawsuits involving ARCT–France. Although an interest of a third party corporation from a commercial standpoint would not establish a sufficient community of interest, the fact that the communications are among formally different corporate entities which are under common ownership or control leads this court to treat such inter-related-corporate communications in the same manner as intra-corporate communications. In the leading case of United States v. United Shoe Machinery Corp., supra, 89 F.Supp. at 359, the court stated.

For present purposes the client is United Shoe Machinery Corporation

and all its subsidiaries and affiliates considered collectively.

Thus, if a corporation with a legal interest in an attorney-client communication relays it to another related corporation, the attorney-client privilege is not thereby waived. If the communication were relayed to an unrelated third-party corporation, the privilege would be waived.

If any communication is made among Chavanoz, its parent, affiliates, and/or subsidiaries for which an attorney-client privilege is claimed, there is no waiver of the privilege. If any communication is made among ARCT–France and/or its subsidiaries for which an attorney-client privilege is claimed, there is likewise no waiver of the privilege because, for all practical purposes, the corporate communicants are identical, although they are legally different.

*Non-Litigation Matters*

The attorney-client privilege is also asserted for numerous minor matters that arose over the years for which legal advice was requested and received but from which no litigation resulted. These matters are too incidental to be discussed individually herein but the parties to this litigation can rest assured that this court will apply to the best of its ability the guidelines that it has recited above as to the community of interest claim on any communication for which the attorney-client privilege is asserted. The key consideration will always be whether the nature of the interest is identical and legal. The rulings on all of these individual matters will appear clearly in this court's order to be issued after the final in-camera inspection of each of the remaining documents requested to be reviewed.

## TRADE SECRETS

The trade secret privilege is asserted by plaintiff for two types of documents: confidential business matters and technical information. The confidential business matters primarily involve communications relating the names of licensees or stating the amounts of royalties collected. Most of these documents were produced in expurgated form. The technical information relates to new developments in machinery not sought to be patented, and abandoned, as well as presently pending, patent applications in the United States Patent Office.

The general rule concerning discovery of trade secrets in cases before the federal courts is succinctly stated in 4 Moore, Federal Practice, ¶ 26.60[4], at 242–45 (2d ed. 1970).

No absolute privilege protects trade secrets from disclosure through the discovery process. If the information sought is relevant and necessary, at the discovery stage of the litigation, to the preparation of the case of the applicant therefor, disclosure will be required. However, the courts are loath to order disclosure of trade secrets absent a clear showing of an immediate need for the information requested. (Footnotes omitted.)

 This court finds that confidential business matters and technical information are trade secrets. That fact alone will not protect them from discovery. Once the privilege is asserted by the owner, the party *seeking* discovery must make a clear showing that the documents are relevant to the *issues involved in this litigation.* In doubtful situations, production will *not* be ordered. The court is aware that this standard is higher than the hurdle for discovery of unprivileged but relevant documents but this court considers such a higher standard necessary in order to guard against the possible use of doubtfully relevant trade secrets by the opposing parties for their own business ends. In order to guard against the possible use of the trade secrets by a third party, the owner of the trade secrets should move for a protective order under Federal Rule of Civil Procedure 26(c)(7):

(c) Protective Orders. Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court in which

the action is pending . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: . . . (7) that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way . . . .

This court must determine: first, which communications are trade secrets; and second, whether the parties seeking discovery have made a clear showing that the trade secret privilege should not be honored because of the relevancy of the communications to the issues involved in this litigation.

■■■ As to the specific commercial communications sought to be privileged as trade secrets in this case, the court finds that the names of licensees and the amounts of royalties collected are confidential business matters entitled to the trade secret privilege. The court also finds that the parties seeking discovery have not made a clear showing that the documents are relevant to the issues involved in this litigation.

These confidential business matters are akin to customer lists. Such lists were protected from discovery in a contract action entitled Natural Utility Service, Inc. v. Wisconsin Centrifugal Foundry, Inc., 44 F.R.D. 539 (E.D.Wis. 1968) but were ordered produced because of their relevancy in another contract action entitled Von Witte v. American Elite, Inc., 20 F.R.D. 221 (S.D.N. Y.1957).

■■■ As to the specific technical communications sought to be privileged as trade secrets in this case, the court finds that the information relating to new developments in machinery not sought to be patented and abandoned as well as presently pending patent applications in the United States Patent Office are trade secrets.

■■■ The United States Patent Office is under a statutory mandate to maintain the confidential status of pending and abandoned patent applications. 35 U.S.C. § 122 (1952) provides:

Applications for patents shall be kept in confidence by the Patent Office and no information concerning the same given without authority of the applicant or owner unless necessary to carry out the provisions of any Act of Congress or in such special circumstances as may be determined by the Commissioner.

It should be noted that this provision does not apply to the United States District Courts. The disclosure of abandoned or pending patent applications may be compelled under a protective order only where there is a clear showing of the relevancy of the applications to issues involved in the present litigation. Struthers Scientific & International Corp. v. General Foods Corp., 45 F.R.D. 375 (S.D.Tex.1968). In a suit for patent infringement and antitrust violations, plaintiff was entitled to discovery of defendants' patent application filed in the United States Patent Office. Britt Tech Corp. v. L & A Products, Inc., 223 F.Supp. 126 (D.Miss.1963).

■■■ Nevertheless, this court again finds that the parties seeking discovery have not made a sufficiently clear showing that the patent applications and other technical information sought are relevant to the issues involved in this litigation. Four years ago, during the early course of the presently continuing discovery, District Judge (now Circuit Judge) Russell said in Deering Milliken Research Corp. v. Tex-Elastic Corp., 320 F.Supp. 806, 810 (D.S.C.1970):

And, while the Courts will not hesitate to require a party to answer whether it has filed or abandoned a patent application . . . , it normally does not do so unless it is clear that such information is materially connected with the instant litigation.

The thowsters have failed to carry their burden of proof that the technical trade secrets sought are clearly relevant to the issues in this case and therefore their request for production will be denied.

## RELEVANCY

■■ Though documents requested to be produced under federal discovery rules must be relevant to the litigation, the concept of relevancy is to be given a liberal interpretation. Bailey v. Meister Brau, Inc., 55 F.R.D. 211 (N.D.Ill.1972); General Telephone & Electronics Laboratories, Inc. v. National Video Corp., 297 F.Supp. 981 (N.D.Ill.1968); Oil Tank Cleaning Corp. v. Reinauer Transportation Co., 149 F.Supp. 401 (E.D.N.Y. 1957); V. D. Anderson Co. v. Helena Cotton Oil Co., 117 F.Supp. 932 (E.D. Ark.1954).

Fed.R.Civ.P. 26(b)(1) (as amended 1970) provides: (b) Scope of Discovery. Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows:

(1) In General. Parties may obtain discovery regarding any matter, not privileged, *which is relevant to the subject matter involved in the pending action,* whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence. (Emphasis added.)

Relevancy required as to the production of documents is not equated with that ordinarily used in determining the admissibility of evidence. The test is the relevancy to the subject matter which is broader than the relevancy to the issues presented by the pleadings. Triangle Mfg. Co. v. Paramount Bag Mfg. Co., 35 F.R.D. 540 (E.D.N.Y.1964); Transmirra Products Corp. v. Monsanto Chemical Co., 26 F.R.D. 572 (S.D.N.Y.1960); Dimenco v. Pennsylvania R. Co., 19 F.R.D. 499 (D.Del.1957).

For instruction on the scope of general relevance, see Horizons Titanium Corp. v. Norton Co., 290 F.2d 421 (1st Cir. 1961); Bailey v. Meister Brau, Inc., supra; DaSilva v. Moore-McCormack Lines, Inc., 47 F.R.D. 364 (E.D.Pa. 1969); Wood v. Todd Shipyards, 45 F. R.D. 363 (S.D.Tex.1968); Berry v. Haynes, 41 F.R.D. 243 (S.D.Fla.1966); Cox v. E. I. DuPont de Nemours & Co., 38 F.R.D. 396 (D.S.C.1965). As to inquiry into matters useful in discovering admissible evidence, see Freeman v. Seligson, 132 U.S.App.D.C. 56, 405 F.2d 1326 (D.C.Cir.1968); Bailey v. Meister Brau, Inc., supra; Metal Foil Products Mfg. Co. v. Reynolds Metals Co., 55 F. R.D. 491 (E.D.Va.1970); Carrier Mfg. Co. v. Rex Chainbelt, Inc., 281 F.Supp. 717 (E.D.Wis.1968); Hooker v. Raytheon Co., 31 F.R.D. 120 (S.D.Cal.1962).

■■■ If the documents requested to be produced are relevant and not prepared in anticipation of litigation, they are discoverable without a showing of undue hardship and substantial need. Thomas Organ Co. v. Jadranska Slobodna Plovidba, 54 F.R.D. 367 (N.D. Ill.1972). The documents, files, records, and books of a corporation, when relevant, may be required by a court order to be produced, inspected, or copied. In re Indusco, Inc., 15 F.R.D. 7 (S.D. N.Y.1953); Colonial Airlines, Inc. v. Janas, 13 F.R.D. 199 (S.D.N.Y.1952).

The relevancy and the admissibility of documents depend on the circumstances of the particular case. In this case, plaintiffs withhold from production, not because of any privilege but on the grounds of irrelevancy, documents dealing with foreign commerce not involving the United States. This part of this order calls for a determination of whether or not those documents are within the

general scope of discovery envisaged by Rule 26(b)(1). The production request of the throwsters relates to their counterclaim, as the party seeking discovery of relevant documents, on certain antitrust issues. See appendix for the throwsters' specific antitrust contentions 1, 2, and 3. The documents presently under scrutiny are alleged by the throwsters to relate to the division of the world market for false twist machinery and technology. The division of world markets was found to be an antitrust violation under Sherman Act § 1 and § 2 in United States v. National Lead Co., 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077 (1947) and in Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).

■■■ Plaintiff has based its refusal to turn over documents relating to European activities on the grounds that they have nothing to do with the foreign commerce of the United States. Evidence of anticompetitive conduct relating only to foreign commerce not involving the United States is admissible where such conduct shows links in a chain designed to control the commerce of a substantial part of the world, including the foreign commerce of the United States. United States v. National Lead Co., 63 F.Supp. 513 (S.D.N.Y.1945) aff'd, 332 U.S. 319, 67 S.Ct. 1634, 91 L. Ed. 2077 (1947); United States v. Timken Roller Bearing Co., 83 F.Supp. 284 (N.D.Ohio 1949), aff'd, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).

■■■ This court finds that, where the court is uncertain as to whether or not an unprivileged document, whose production is resisted solely on grounds of irrelevancy, is relevant to the subject matter involved, production should be ordered. This court will not be a party to a suffocation of the truth. The party seeking discovery can better determine the usefulness of an ambivalent docu-

ment to the presentation of its case and this court will not foreclose that opportunity. If the patent owner cannot convince the court of the irrelevancy of the document to the subject matter involved in the litigation, the court will find that plaintiff has failed to carry its burden of proof.

■■■ In order to guard against the possible use of genuinely confidential documents by a third party, plaintiff should move for a protective order under Federal Rule of Civil Procedure 26(c)(7) on its foreign commerce documents.

### APPENDIX

The throwsters' specific antitrust and patent misuse claims may be categorized as follows:

1. Restrictions on use of ARCT false twist machines after purchase and passage of title—violations of Section 1 of the Sherman Act and of Section 7 of the Clayton Act.*

2. Restriction on resale of ARCT false twist machines—violations of Section 1 of the Sherman Act.

3. Agreements affecting the availability to competitors of equipment and supplies essential to their businesses, and affording a conspirator anticompetitive access to confidential information—violations of Section 1 of the Sherman Act.

4. Package licensing—violations of Section 1 of the Sherman Act and patent misuse.

5. Attempts to monopolize by defendants through practices of DMRC —violations of Section 2 of the Sherman Act.

6. 1964 Agreements among Chavanoz, DMRC, ARCT–France, Whitin, and Leesona—violations of Section 1 and Section 2 of the Sherman Act.

---

* References throughout this appendix to the Sherman Act also include a section of the Wilson Tariff Act, 15 U.S.C. § 8, which specifically proscribes restraints of trade involving articles imported into the United States.

7. Attempts and agreements to extend the monopoly under the Chavanoz patents beyond the lawful time, scope and subject matter of the patent monopoly—violations of Sections 1 and 2 of the Sherman Act and patent misuse.

8. Inequitable conduct in dealings with the United States Patent Office—unenforceability of the patents and violations of Sections 1 and 2 of the Sherman Act.

9. Acts independently establishing patent misuse—unenforceability of the patents and license agreements.

10. Collusive restraints on magnetic spindles—violations of Section 1 of the Sherman Act.

## SUPPLEMENTAL ORDER

### TO ORDER OF MAY 30, 1974

On May 30, 1974, this court issued an order on motion of former non-exclusive patent use-sublicensee defendants (hereinafter designated throwsters), filed pursuant to Federal Rules of Civil Procedure 34(a)(1) and 26(b)(3), for production of approximately 4,500 documents submitted in-camera by plaintiff patent owner and the exclusive patent-licensees of the manufacturing, sale, and use-rights (hereinafter designated associates) who resisted production under claims of work product, attorney-client, trade secret, or irrelevancy.

In that opinion, the court set forth the guidelines it intended to apply in a final in-camera inspection of the submitted documents. The court required the parties to submit four lists of documents: A, those of which the throwsters will abandon pursuit; B, those to which the throwsters believe they are entitled but to which they are convinced the court will disallow production; C, those to which the throwsters consider the court will allow production but to which the associates continue to resist production; and D, those to which the associates no longer resist production. The throwsters also submitted a list of documents for which it contended it had insufficient identification to make an intelligent characterization.

## INTER PARTES PROCEEDINGS

As a result of the submission of these lists, the number of documents left to be reviewed in-camera was reduced to approximately 1,250. Oral arguments were heard for five full days on the applicability of the guidelines to each of the remaining contested documents in the throwsters' List C. During the course of oral arguments additional information was supplied by the associates as to those insufficiently identified documents and the same were reclassified into Lists A, B, or C. Despite their not having seen the documents, the throwsters were able to argue intelligently because they were supplied a 405-page edited index of the documents, prepared earlier by the court during ten full days of in-camera examination with assistant counsel for the associates.

During the course of the oral arguments, many of the documents originally classified on List C were recategorized into Lists A, B, or D, thus further reducing the number of documents left for final in-camera review to 1,010. The court examined these documents individually in light of the comments recorded in the 891-page transcript and dictated 43 tapes [1] for 15 full days.[2] The court's

---

1. During the course of transcribing the tapes, the secretary noted numerous gaps and unintelligible remarks in tape no. 22, apparently caused by an inherent defect therein of an undetermined nature. The rulings on the documents dictated onto this tape were redictated onto a substitute tape and the original tape no. 22 was destroyed by the secretary upon directions from the court.

2. This order was ready in July shortly after the inter parties proceedings were completed in June but its issuance was held up awaiting an opinion from the Fourth Circuit on this court's order of February 5, later filed by the Court of Appeals on October 18, 1974, in No. 74–1221.

final ruling on each document appears in an attached appendix.[3] In discussing many of the individual documents, the court sustained all, at least one, or none, of the privilege claims made. When one or more of the several claims were not honored, the recognition of any one claim would prevent production. This statement is made to avoid any possible confusion that may arise where the court honored some and refused to honor other privilege claims for a particular document.

Before proceeding to rule on each of the documents, the court finds it necessary to clarify parts of its order of May 30, 1974, because of clashing interpretations and other comments made by the parties during the course of oral arguments on the applicability of the guidelines to various documents. The following remarks are to be read in the context of the pertinent sections of the order of May 30, 1974.

## WORK PRODUCT IMMUNITY

■ The subject matter waiver doctrine applies only to attorney-client privilege claims and not to work product immunity claims. The distinction, in the eyes of this court, is based on the practical application of such a doctrine to work product documents. If one work product document is either voluntarily or inadvertently produced from either terminated or pending litigation, where does the waiver end? If a subject matter waiver of a work product immunity claim is recognized as a doctrine of law, harsh results will necessarily follow, conceivably causing wholesale production of all work product documents from either a terminated or pending lawsuit whenever production of any work product document is considered a waiver. The net effect of such a rule would result

in great reluctance to produce *any* work product documents for fear that it might waive the immunity as to *all* similar documents. Such a result is not consonant with the need for economy of judicial time and the avoidance of burdening the courts with in-camera inspections of all conceivably privileged documents.

Such a disastrous consequence does not befall a litigant whenever it either voluntarily or inadvertently produces one privileged attorney-client communication because such production would constitute a waiver of only the corresponding communications relating to the responses to, and requests for, legal advice on the same subject.

Thus, the rule of subject matter waiver for privileged attorney-client communications is manageable whereas a similar rule for work product documents is not manageable. As a result, the former rule is recognized by this court while the latter rule will not be adopted.

■ In the order of May 30, 1974, pages 5 and 6, this court said:

[T]he absolute admonition against court-ordered disclosure of opinion work product "concerning *the* litigation" contained in Federal Rule of Civil Procedure 26(b)(3) [is] limited to a currently pending lawsuit. (Emphasis in original.)

This statement applies to both this lawsuit and any other lawsuit that is currently pending in any jurisdiction, whether in the United States or in a foreign country. Rule 26(b)(3) is interpreted to prevent production of opinion work product documents from present or other ongoing litigation, whether or not the party seeking discovery is involved in the other lawsuit. A party involved in more than one lawsuit at the same time cannot continue to litigate

---

3. Many of the 1,010 documents involved a decision on the merits of the work product immunity as analyzed by this court in its order of February 5, 1974 but reversed by the Fourth Circuit. Since the court is informed that an appeal is presently in process to the

United States Supreme Court, this court has withheld a final ruling on any document involving the merits of the work product immunity until the issue is resolved by the highest authority, or certiorari is refused.

effectively, either in the United States or abroad, if its adversaries in one case can gain access to its opinion work product documents in another currently pending case involving a third party and/or involving the same subject matter for which privilege is claimed or sustained in the first litigation.

## ATTORNEY-CLIENT PRIVILEGE

### I

### SUBJECT MATTER WAIVER

■ The voluntary waiver by a client, despite a written or oral assertion of limitation, of one or more *privileged* documents passing between a certain attorney and the client discussing a certain subject waives the privilege as to all communications between the same attorney and the same client on the same subject made *before* the privileged document was voluntarily waived. To establish a waiver of all later generated privileged documents would effectively disallow the parties from forever thereafter discussing the same subject matter in any other privileged context.

■ The voluntary waiver by a client, even without limitation, of one or more *nonprivileged* documents passing between the same attorney and the same client discussing the same subject does not waive the *privileged* communications between the same attorney and the same client on the same subject.

■■ Notwithstanding a community of interest among the associates, a subject matter waiver of a privileged communication, discussing a particular subject between one client and its attorney does not constitute a subject matter waiver of other privileged communications discussing the same subject between a different client and its attorney. Each client has its own attorney-client privilege and only the particular client can waive the privilege.

It would be grossly unfair to recognize a rule where a client, because it has a mutual interest in a subject, could waive the attorney-client privilege of another client, simply because both clients at one time retained the same attorney in earlier controversies and now are parties on the same side of a later instituted lawsuit.

The associates contend that the recognition of the principle of subject matter waiver of the attorney-client privilege will inhibit the voluntary production of documents in later litigation, thus resulting in massive in-camera submissions of all privileged documents to all courts presiding over a complicated case such as this one. This court cannot agree that such dire consequences will result. This case is an exception rather than the rule.

Ordinarily, nonprivileged documents are produced by the parties while other documents are in good faith withheld on a claim of privilege. An attorney's word is taken on its face. Such is the usual case, and that is the end of it; but in this case, it has been only the beginning.

■ The principle of subject matter waiver is not new but has been the law for some time, as evidenced by the legal commentary thereon cited in this court's order of May 30, 1974, pages 11 through 15. Where a party has produced non-incriminating privileged attorney-client documents and withheld other incriminating documents, an adversary may rightfully assert the doctrine of subject matter waiver. Also, where a party has inadvertently waived the attorney-client privilege by the voluntary production of otherwise privileged communications because of its carelessness in examining the documents before their production, an adversary again may rightfully assert the doctrine of subject matter waiver. Unfortunately, both of these instances have occurred on a large scale in this case. This court cannot see how a party's rightful assertion of the subject matter waiver principle in this case will have any effect on voluntary production of documents in any other case.

Another reason for this massive in-camera submission in this case is the bitterness, hostility, and distrust that the attorneys have developed for each other. Claims of privilege have been doubted and, in some situations, rightfully so. As a result, this court has been saddled with the burden of conducting this in-camera examination. This court has no qualms about saying that this has been the most arduous task it has ever undertaken in its 26 years of public service. This case has already been pending five years and, if it never gets to trial, it will not be because this judge has not tried, it will be because he has died![4]

## II

### CONTROL GROUP AND SUBJECT MATTER TESTS

The parties agreed, without argument, to add the following individuals to the lists of control group members, attorneys, agents, employees, or representatives acting at the direction of a control group member.

Control group members for Chavanoz: L. Chatin, former President.

Agents, employees, or representatives acting for Chavanoz: R. Chatin, former Director of Research.

Agents, employees, or representatives acting for DMI: Owings, Plant Manager at Gayley.

Control group members for DMRC: Newton, former President.

Attorneys for DMRC in Mexico: Uthoff.

Agents, employees, or representatives acting for Whitin: Dalton, Sales Manager.

Copies of some of the documents submitted in-camera for which an attorney-client privilege was claimed, were sent to a corporation in general, without any direction as to whom it was intended and without any limitation as to who could examine it. In such situations, the court found that the party asserting the privilege had failed to carry its burden of proof because the necessary confidentiality was lacking.

The associates argue that confidentiality is present on the grounds that the only logical presumption is that, within the confines of the corporation, the communication would go to the proper corporate personnel responsible for handling the matter discussed in the letter. Such an argument misses the point because the court does not doubt that such a result occurs. The court presumes the confidentiality to be lacking because of what logically would happen to such a communication *enroute* to the proper recipients within the corporate channels.

If one writes a letter addressed only to "General Motors, Detroit, Michigan" or any other large corporation, such as the associated firms in this litigation, it will probably first be opened by someone in the mailroom or a receptionist who will have to read its contents. Most likely, consultation will be had with another mailroom employee or secretary who will also read it. It may be sent to a corporate official who is not the proper recipient. After reading it, he or she may send it back to the mailroom or receptionist or may refer it to another corporate official. Eventually, it will reach the responsible personnel. In the meantime, it is not unreasonable to as-

---

4. This display of gladiator-type advocacy appears to be prevalent in patent-antitrust suits. See Clark, the Risks and Costs of Patent Litigation: A House Counsel's View, 1973 Utah L.Rev. 618, 619–23, in which a patent attorney discusses the personal bitterness and burdensome, harassing discovery process in such suits. As an example, the author discusses the companion case to this suit in which many of the same parties are involved. In re Yarn Processing Patent Validity Litigation (M.D.Fla.1968-present) is a consolidated multi-district case of 51 suits involving Leesona Corp., the chief competitor of the associates herein. In that case, four million documents have been produced and 250 witnesses deposed. This consolidated multi-district case embraces 37 suits. Here, only one million documents have been produced and a mere 85 witnesses deposed.

sume that several persons have read the letter who were not privy thereto. If interesting enough, the reader may later comment upon it at the supper table with the family. Even after its reading by the proper recipient, he or she may refer it to another or put it in the daily general circulation file for any others who care to comment upon it. Of course, no one really knows how these documents progressed through the corporate channels. In the absence of any showing as to the manner in which such generally addressed attorney-client communications are handled, this court will presume that the necessary confidentiality was breached, in accordance with the strict confinement of the privilege mandated in *N.L.R.B. v. Harvey*, 349 F.2d 900 (4th Cir. 1965).

This presumption against confidentiality is not an impossible burden to rebut. Indeed, some letters presented in-camera and addressed to a corporation generally were found entitled to the attorney-client privilege because rubber stamps or other marks imprinted thereon indicated that only the responsible recipients were privy to the communication.

■ Confidentiality was presumed for communications addressed to a law firm or a corporate legal department in general because, even if the wrong attorney first read a letter from a client of another attorney in the office, he or she would also be bound by the attorney-client privilege not to divulge its contents.

### III

### CONDUIT THEORY OF PATENT PROSECUTION

In this court's order of May 30, 1974, page 1168, it is stated:

This court will order production of documents generated by agents, attorneys, and inventors in the course of applying for a patent from the United States Patent Office. The Supreme Court has stated that public policy demands complete and candid disclosure by inventors, patent attorneys, and agents in their dealings with the Patent Office. [Citation omitted.] This court will require no less frankness when the validity of patents are contested in this federal trial court.

From this general statement, the court proceeded to enumerate ten specific groups of documents for which production would be ordered. This enumeration appears on page 25 of the May 30, 1974 order.

■ It is a cardinal rule in the construction of judicial opinions that general statements must be read in the light of more specific later statements. Thus, a document generated by an agent, attorney, or inventor in the course of applying for a patent from the United States Patent Office must fall within at least one of the ten specific groups of documents enumerated on page 25 before production will be ordered.

Just as the corporate patent owner, Chavanoz, had an attorney-client relationship with DAPID, the patent department of Rhodiaceta, for the prosecution of applications in France, there existed an attorney-client relationship between Chavanoz and the patent department of DMRC for the prosecution of applications in the United States. DMRC itself was not the client and exercised no independent discretion in the prosecution of Chavanoz applications. Its patent department functioned as the American patent attorney for Chavanoz. Therefore, where this court applies one of the ten categories enumerated on page 1168, particularly the conduit theory of patent prosecution marked as ¶ (9), the court specifically states whether or not the attorney-client privilege attaches.

### IV

### FOREIGN PATENT AGENTS

The associates contend that communications between a client and its foreign patent agents, as well as its American patent agents, are entitled to protection

under the attorney-client privilege, citing Sperry v. Florida, 373 U.S. 379, 83 S.Ct. 1322, 10 L.Ed.2d 428 (1963). The associates misconstrue the thrust of that case.

In *Sperry*, supra, a Florida patent agent, admitted to practice before the United States Patent Offices but not before the Florida State Supreme Court, was enjoined, upon petition of the state bar, from the unauthorized practice of law by the state supreme court. The United States Supreme Court reversed, finding that the state had no power to enjoin lay persons, licensed by the Patent Office under a federal statute, from the practice of patent law, as opposed to *general* law. In doing so, the Supreme Court made the specific finding that patent agents perform legal services. *Id.*, at 383, 83 S.Ct. 1322.

The associates would extrapolate this case to have this court rule that, as a necessary consequence, the attorney-client privilege attaches to communications with American patent agents, and, likewise, with foreign patent agents.

Although such a rule appears to be a logical extension of *Sperry*, this court will not adopt it in view of other earlier lower federal court cases, cited in this court's order of May 30, 1974 pages 1169 and 1170, which ruled that the attorney-client privilege is limited to lawyers and does not encompass non-lawyer patent agents. These cases were not overruled by the Supreme Court in *Sperry*, and therefore must be considered good law. This court refuses to consider these cases overruled *sub silentio*.

A finding that a non-lawyer performs legal services does not create an attorney-client privilege for communications with that nonlawyer. Legal secretaries and paraprofessionals also sometimes perform legal services but no attorney-client privilege attaches for communications with them because they are not attorneys. The same finding must be made as to nonlawyer patent agents.

Of course, the existence or nonexistence of an attorney-client privilege for communications with patent agents is separate from the express creation in Federal Rule of Civil Procedure 26(b) (3) of a work product immunity for legal services performed by nonlawyers in anticipation of and during the course of litigation, such as interferences in the United States Patent Office and patent infringement suits in the federal district courts.

V

## CRIME, FRAUD OR TORT EXCEPTION TO THE ATTORNEY-CLIENT PRIVILEGE

In this court's order of May 30, 1974, page 1172, it was stated that there must be a prima facies showing of a crime, fraud, or tort before an exception to the attorney-client privilege will be created, requiring production of otherwise confidential communications between an attorney and a client.

The throwsters have asserted that there were frauds perpetrated upon the United States Patent Office in the prosecution of certain applications and that there was a business tort committed by the settlement in 1964 of patent-antitrust litigation in Boston and South Carolina between the associates and Leesona Corporation, their chief competitor.

There has been a prima facie showing of frauds in the prosecution of U. S. Pat. Nos. 3,137,119 and 3,382,656 by a finding of invalidity under 35 U.S.C. § 102(d), for filing the U. S. application more than one year after the foreign counterpart patent issued. See this court's order appearing at 353 F.Supp. 826 (D.S.C.1973), affirmed per curiam, 487 F.2d 459 (4th Cir. 1973), cert. denied, 415 U.S. 978, 94 S.Ct. 1565, 39 L.Ed.2d 874 (1974). In the prosecution of applications, prima facie evidence of an intent to defraud the Patent Office could be found in the privileged communication itself. In such situations, a fraud

exception to the attorney-client privilege is recognized by this court. Of course, such a finding is not to be taken as a presumption of this court's final disposition on the merits.

The throwsters have made a prima facie showing that various other frauds were perpetrated upon the Patent Office in the prosecution of some of the 18 other applications that issued as patents. Such findings appear in the analysis of various documents ruled upon in the appendix hereto, relating to the particular patent charged to be fraudulently obtained. Such a finding removes the attorney-client privilege under the fraud exception, for communications among the corporate patent owner, the assignor-inventor, and the various patent attorneys and agents who handled the applications.

For some of these applications which have issued and are still valid patents, the privileged attorney-client communications submitted in-camera gave further prima facie evidence of a fraud on the Patent Office while other such communications tend to negate the commission of any fraud.

In both instances, this court has removed the attorney-client privilege because of the prima facie showing made from other documents. The associates have asserted that such a ruling is too harsh where the attorney-client communication shows that no such fraud was committed. They suggest that the privilege should be honored in such instances and the throwsters should be left to their own devices. This court is constrained to disagree.

■■ Where a prima facie showing of fraud has been made from other documents, production will be ordered of otherwise privileged attorney-client communications which tend to show the innocence, as well as the guilt, of the parties charged with the fraud. With a prima facie showing of fraud staring in its face from other documents, the court will not deny production of in-camera documents tending to show innocence because to do so will effectively constitute a prejudgment of the case and cast a shadow upon the integrity of the court.

It is a serious charge that a fraud has been perpetrated upon the Patent Office, casting a doubt on the validity of the patent involved. The true state of affairs must come out. The innocent parties must be vindicated; valid patents should not continue to exist under any doubts and, where there has been a fraud, the patent should be invalidated.

■■■ There has also been a prima facie showing of a business tort, i. e., an antitrust violation under Sherman Act § 1 for an unreasonable restraint on trade, by the 1964 settlement agreement between the Associates and Leesona Corporation. That a settlement of a patent case by competitors may constitute an antitrust violation was clearly established in United States v. Singer Mfg. Co., 374 U.S. 174, 83 S.Ct. 1773, 10 L.Ed. 2d 823 (1963). Nevertheless, the fact of settlement does not establish by itself a prima facie showing of a business tort. There must be at least a prima facie showing of bad faith on the part of one party in entering into the settlement agreement. In a patent-antitrust case, this may be established by a showing that one party believed it had a substantial likelihood of success in declaring the opponent's patents invalid [5] and in proving the opponent guilty of an antitrust violation. The throwsters have made such a showing.

In order to remove the privilege on attorney-client documents bearing on the

5. The throwsters have been using the terminology that the associates had "knowledge" of the invalidity of Leesona's Permatwist patents in the terminated Boston and South Carolina lawsuits. Such a characterization is inapposite because an attorney cannot "know" that a patent is invalid but only can render a professional opinion that there is a substantial likelihood that a court would find the patent invalid. A patent does not become invalid until declared so by the final appellate court and therefore there can be no such "knowledge" of invalidity, only surmise thereof.

associates' opinion that there was a substantial likelihood of success in declaring the opponent's patents invalid, the throwsters offer Exhibit No. 2129, a one page letter from Dr. Norman C. Armitage, corporate general house counsel and Vice-President of the client, DMRC, to Mr. John H. Bolton, Jr., Vice-President in charge of Marketing for the client, Whitin Machine Works, dated August 25, 1961. The exhibit states:

> The sessions this week at Mr. Brumbaugh's office [patent attorney for the clients] were very valuable. The principal reason for our meeting was to go over the prior art patents in the matter of the Leesona v. Cotwool suit [in South Carolina] and we made notations on a good number which should convince any court that the three [Permatwist] patents [owned by Leesona] in suit are fully anticipated [i. e., invalid under 35 U.S.C. § 102(a)].

The associates make two counter arguments. First, this statement was made before Burlington, the largest throwster in the world and a party on the opposing side in this case, entered into a 1963 settlement agreement, via its subsidiary, Madison Throwing Co., with Leesona in which it acknowledged the validity of the Permatwist patents.[6] Second, the settlement agreement on the patent issue was prompted by a declaration of validity of the Permatwist patents in the courts of Canada, a country which has patent laws very similar to those in the United States, in February, 1964, more than one month before the settlement agreement now being questioned was finalized.

▮ These counter arguments, although they may carry the day on the merits, need not be answered by this court at this time because the court's function in making a determination as to whether there has been a prima facie showing is akin to that of a grand jury, i. e., only the evidence of the prosecution is considered and in the most unfavorable light against the accused.

In order to remove the privilege on attorney-client documents bearing on the associates' opinion that there was a substantial likelihood of success in proving the opponent guilty of an antitrust violation, the throwsters offer Exhibit No. 633–A, a three-page letter from Dr. Armitage to Mr. Leo M. Soep, a French patent agent and the representative of the client, Chavanoz, dated August 19, 1963. The exhibit states:

> You will recall that at the time of our meetings in New York and Boston I raised the question as to whether there might not be a valid counterclaim by Whitin against Leesona for violation of the anti-trust statutes. Granville [M. Brumbaugh, Sr., Esquire] has taken this under consideration and has now reached an opinion that Whitin would have a good chance of establishing such a counterclaim. He is consulting with an expert in anti-trust matters to see whether this expert agrees with him, and a decision will then have to be made as to whether the counterclaim will be lodged.

▮ Even though armed with an attorney's opinion that the Permatwist patents owned by Leesona were invalid under 35 U.S.C. § 102(a) for anticipation by the prior art and that Leesona was most probably guilty of violating the antitrust laws, the associates entered into the settlement agreement with Leesona on March 31, 1964. The two exhibits quoted above would indicate alone a prima facie showing of bad faith in settling the Boston and South Carolina lawsuits out of court. The United States Supreme Court has said that it is not enough for the party owning the

---

6. Stoddard and Seem U. S. Pat. Nos. 2,803,105, 2,803,106, and 2,803,108. These patents were declared invalid under 35 U.S.C. § 102 (b) for a public use more than one year before the applications were filed in In re Yarn Processing Patent Validity Litigation, 360 F. Supp. 74 (M.D.Fla.1973), reversed, 498 F. 2d 271 (5th Cir. 1974). Of course, no one in 1964 had the benefit of foresight as to this 1973 decision.

patents to be in good faith in settling a lawsuit; *all* parties must be in good faith. See Standard Oil Co. (Indiana) v. United States, 283 U.S. 225, 51 S.Ct. 429, 75 L.Ed. 999 (1931).

Thus, this prima facie showing of an antitrust violation establishes the tort exception to the attorney-client privilege, requiring production of all confidential communications that show the opinions of the associates' attorneys with respect to: first, the invalidity of Leesona's Permatwist patents; second, the non-infringement thereof by ARCT FT machines; and third, the violation of the antitrust laws by Leesona.

█ This tort exception to the attorney-client privilege will be considered to be applicable only after, and not before, the settlement negotiations were begun because the alleged bad faith could not come into existence until such time. It is not a tort for an attorney to give an opinion to his client that there is a good case against the opposing party. Only after the client, armed with the attorney's opinion, enters into negotiations with the opposing party *and* eventually settles a patent case, does any inference of an antitrust conspiracy arise. Because of the nature of a patent as a limited monopoly, settlement of patent cases must be viewed by the courts with extreme care.[7] Of course, if the case is not settled and goes to trial on the merits, as occurred in the Brooklyn litiga-

tion between DMRC and Leesona, the abortive settlement negotiations cannot give rise to any inference of an antitrust conspiracy.

## TRADE SECRETS AND RELEVANCY

█ The throwsters have urged the adoption of a novel principle of law to be known as subject matter waiver of the trade secret privilege. They offer various documents discussing the confidential business agreements and the technical information classified as trade secrets and sought because of their supposed relevancy to various issues involved in this litigation.

This court does not recognize any such doctrine of law known as subject matter waiver of the trade secret privilege. The value of such a principle is questionable because of the possible severe detrimental effects that may be worked upon the holder of the trade secret. Also, its application is enigmatic to this court.

█ Nevertheless, the documents supposedly constituting a subject matter waiver have been considered in this court's analysis of the relevancy of the trade secrets to the issues in this lawsuit. Where a determination of relevancy has been made, production of the trade secrets have been compelled under protective orders to be prepared by the holders of the trade secrets in accordance with Federal Rule of Civil Procedure 26(c)(7).[8]

---

7. As a legislative reaction to the settlement of interferences in the Patent Office, found by lower federal courts to be sometimes an antitrust conspiracy in violation of Sherman Act § 1, and eventually so recognized in 1963 by the Supreme Court in Singer, *supra*, Congress enacted 35 U.S.C. § 135(c) (1962) which provides:

 Any agreement, or understanding between parties to an interference, including any collateral agreements referred to therein, made in connection with or in contemplation of the termination of the interference, shall be in writing and a true copy thereof filed in the Patent Office before the termination of the interference as between the said

parties to the agreement or understanding. . . .

8. Fed.R.Civ.P. 26(c)(7) provides:
 Upon motion by party . . ., and for good cause shown, the court in which the action in pending . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:

 . . . . .

 (7) that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way; . . . .

In this court's order of May 30, 1974, page 59, a finding was made that

[t]he throwsters have failed to carry their burden of proof that the technical trade secrets sought are clearly relevant to the issues in this case and therefore their request for production will be denied.

This statement applied only to *technical information* and not *confidential business agreements* with foreign competitors. Indeed, for many but not all such business agreements, a clear showing of the relevance of some such trade secrets to various antitrust issues involved in this litigation is evident from the documents themselves. Findings to this effect are made in the analysis of each of the pertinent business agreements.

### CONCLUSIONS

Productions of documents is hereby ordered to take place thirty days from the date of this order, as follows:

(1) as to throwsters' List A, the motion to produce is denied;

(2) as to throwsters' List B, the motion to produce is denied;

(3) as to throwsters' List C, production is ordered in accordance with the court's rulings in Appendix B hereto;

(4) as to associates' List D, the motion to produce is granted;

(5) as to Appendix A hereto, the court orders the associates to excise from such documents the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative for submission to the court for its approval and orders the balance of the documents to be produced; and

(6) as to associates' documents filed with the court in the current litigations in Great Britain and all communications made with opposing counsel therein before December 31, 1972, the motion to produce is granted.

■ In accordance with the court's responsibility under provisions of 28 U.S.C. § 1292(b), this court, recognizing that this order, in part, is interlocutory in nature and not otherwise appealable, states that controlling questions of law exist as to the issues decided herein, as to which there is a substantial ground for difference of opinion, and an immediate appeal may materially advance the ultimate termination of this litigation.

And it is so ordered.

### ORDER

Motions for reconsideration of portions of the December 19, 1974 Order of this court have been filed on behalf of the Associates and the throwsters. Oral argument was heard on January 13, 1975.

DMRC/Chavanoz requests that this court reconsider certain documents previously held to consist of nothing other than factual work product information. The court "shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." Fed.R. Civ.P. 26(b)(3). DMRC/Chavanoz alleges that the documents in question (DRP 916–20, DR20058 and DR20062) are "clearly within" the zone of protection afforded by Rule 26. Support is said to be found in any "reasonable" reading of Rule 26(b)(3); a reading which is "not narrow, not broad, not expansive" is said to insure the non-disclosure of these documents.

In reply, the throwsters rely on United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). The court there stated that the attorney-client and analogous relationships are

recognized in law by privileges against forced disclosure, established in the Constitution, by statute, or at common law. Whatever their origins, these exceptions to the demand for every man's evidence are not lightly created *nor expansively construed,* for they are in derogation of the search for truth.

*Id.* at 709, 94 S.Ct. at 3108, 41 L.Ed.2d at 1065 (footnote deleted) (emphasis

added). The throwsters contend that the "reasonable" standard suggested by DMRC/Chavanoz is in reality "expansive" and therefore not in accord with the *Nixon* case.

The problem in this motion for reconsideration lies in the articulation of a "reasonable" and "non-expansive" standard against which the meaning of the phrase "mental impressions . . . of an attorney or other representative" may be measured. The lack of definitive case law on this rather narrow point compels this court to attempt to discern the theory behind Rule 26(b)(3) and the decision on which it is based. In Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), the Supreme Court stated that

> Proper preparation of a client's case demands that he [the lawyer] assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference . . . This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways—aptly though roughly termed by the Circuit Court of Appeals in this case as the 'Work product of the lawyer.' Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.

> We do not mean to say that all written materials obtained or prepared by an adversary's counsel with an eye toward litigation are necessarily free from discovery in all cases. Where

relevant and non-privileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of one's case, discovery may properly be had. Such written statements and documents might, under certain circumstances, be admissible in evidence or give clues as to the existence or location of relevant facts. Or they might be useful for purposes of impeachment or corroboration. And production might be justified where the witnesses are no longer available or can be reached only with difficulty. . . . But the general policy against invading the privacy of an attorney's course of preparation is so well recognized and so essential to an orderly working of our system of legal procedure that a burden rests on the one who would invade that privacy to establish adequate reasons to justify production through a subpoena or court order. That burden, we believe, is necessarily implicit in the rules as now constituted.

*Id.* at 511–12, 67 S.Ct. at 393.

Every thought recorded in a writing, even if consisting entirely of factual information, is a "mental impression" of the writer. However, "materials . . . prepared by an adversary's counsel with an eye toward litigation," obviously mental impressions, "are [not] necessarily free from discovery in all cases." *Id.* A *fortiori*, certain mental impressions directed towards preparation for trial are discoverable.

█ There are obviously *degrees* of mental impression. Because of the "general policy against invading the privacy of an attorney's course of preparation," Rule 26 requires that the party seeking discovery must demonstrate that his need for such materials outweighs society's interest in safeguarding the communication. It is illogical to state that all degrees of mental impression, varying from totally creative thought to recognition of accepted fact, require the identical demonstration of need and hardship; so-

ciety's interest in safeguarding the former is much greater than in the latter. Creative legal thought is that category of work product which *"shall* be protected" from all discovery. However, as the work product of the attorney becomes less a matter of creative legal thought and more a mere recognition of observed fact, the work product becomes increasingly susceptible to discovery. The rationale behind *Hickman* and Rule 26 (b)(3)—concern "with protecting the thought processes of lawyers and thus the very adversary system," Duplan Corp. v. Moulinage et Retorderie de Chavanoz, 509 F.2d 730, at 734 (4th Cir., 1974) (hereinafter referred to as the decision of October 18)—therefore becomes less a bar to discovery when a document only tenuously contains the creative "thought processes" of the attorney.

 In the documents which constitute the subject matter of this motion, the creative thought process is so tenuous that the court must stand by its holding of December 19 in ordering production of documents numbered DRP916–20, DR20058 and DR20062. This court believes that in permitting discovery of this factual material, after a showing of substantial need and undue hardship, this ruling is in keeping with the spirit of the conservative approach of the Court of Appeals for the Fourth Circuit.

 DMRC/Chavanoz next request reconsideration of the documents listed in Appendix A of the December 19 Order. They argue that the opinion of the Fourth Circuit imposes an "affirmative obligation" to safeguard all opinion work product, regardless of the degree of creative work involved and regardless of any showing of substantial need and undue hardship. It is argued that, since October 18, hardship, necessity and relevance are no longer proper considerations when dealing with the second sentence of Rule 26(b)(3). This argument asks the court to find that any document containing any degree of work product is undiscoverable; taken to its conclusion, the argument would protect any writing of an attorney.[1] This result is contrary to both the intent of *Hickman* and the wording of Rule 26(b)(3); the court therefore refuses to interpret the October 18 decision of the Fourth Circuit in such an outlandish manner. Rule 26(b)(3) provides that "a party may obtain discovery of documents . . . otherwise discoverable . . . and prepared in anticipation of litigation or for trial . . . ." In light of such language, the Fourth Circuit did not hold that the second sentence of 26(b)(3) *prohibited* discovery of all documents prepared in anticipation of litigation. This consideration, together with the last sentence of the October 18 decision, leads the court to conclude that its previous determination relative to the documents listed in Appendix A of the December 19 Order should stand.

 Third, DMRC/Chavanoz questions the applicability of the "Conduit Theory" to certain specified documents. The fact that these documents, sent from a French patent agent to an American patent attorney, are similar to others which were held to be privileged is not determinative; the privileged letters, responses from the American attorney to the French agent, cannot support the implication that the documents were likely to be used before the United States Patent Office. Reconsideration of the questioned documents has not led this court to conclude that its earlier ruling was in error.

The fourth point raised by DMRC/Chavanoz concerns the discoverability of document number DRP0174. The attorney-client privilege claim for this document was denied December 19 because there was an insufficient showing that the document was either a communication between an attorney and a

---

[1]. Again, a writing of an attorney is a mental impression of an attorney. The only question is one of degree. *See* Page 1190, *supra.*

client or the work product of anyone on the DMRC side of the Brooklyn litigation. While interesting possibilities as to the true nature of this document were raised during argument, this court nevertheless still finds that the burden of proof, imposed on DMRC/Chavanoz, has not been met.

■ On December 19, the work product immunity claim relating to documents VII–13, VII–14, II(i) and 1650–55 was denied because not raised in a timely manner. On August 13, 1973, this court stated:

The *failure to identify* [a claimed privilege], as herein provided, will be considered by the court as an admission by the producing party that the claim of privilege cannot be sustained in fact. (emphasis added).

ARCT-France now requests that the court reconsider its ruling of December 19. To do so would be to ignore the very rationale of the August 13 ruling, the purpose of which was to facilitate a definitive ruling on the documents withheld. This court, cognizant of the vast number of documents submitted in a case of this nature, found it necessary to require that the claimed immunity of a document be clearly enunciated at the time the document was submitted.

In its motion for reconsideration, ARCT-France argues "that inadvertence or delay of counsel would not form a proper basis for an order requiring production of opinion work product documents." This result is said to be mandated by Rule 26(b)(3) and by the October 18 decision—". . . the court *shall* protect against disclosure . . . ." It is even argued that:

if an attorney was to get up in court and say, "Your Honor, I emphatically say that this is not opinion work product," that if Your Honor disagreed, you would still have to protect against disclosure because in this one place, this is a very out of the ordinary provision, the obligation to protect against disclosure is the Court's obligation and

I respectfully submit it can't be waived and even if an attorney wanted to waive it, the Court could not let the attorney waive it.

Transcript of hearing held January 13, 1975, at 91.

Judge Widener, in his opinion of October 18, was concerned with protecting the creative work of an attorney. This protection is essential because an "adversary system of justice relies heavily on the attorneys for its very functioning. And in many or even most cases, nothing less than the lawyer's very best is adequate." *Duplan,* 509 F.2d 730 at 735 (4th Cir., 1974). However, this statement was made within a framework which recognizes that the court is neither expected nor allowed to inject itself into the adversarial process and perform the function of an attorney. If the argument advanced by ARCT-France were to be adopted, claims of work product immunity would not have to be raised by the attorneys. Instead, the entire burden for arguing, as well as deciding, the applicability of the work product immunity doctrine would be placed upon the court. Such a result is neither demanded by the Fourth Circuit nor *permitted* under common law concepts of separation of advocacy and decision. The instant claim of work product immunity was not made in a timely manner; therefore, this court will not make the reconsideration requested by ARCT-France.

The throwsters seek to have certain documents, which have been held to be privileged, transferred from Appendix B to Appendix A of the December 19 Order. Such a disposition would reverse this court's holding of privilege and force later reconsideration of these documents. This result is said to be mandated by the possibility that the status of the questioned documents "may" change if the United States Supreme Court grants certiorari on the October 18 decision of the Fourth Circuit. This motion is denied. If certiorari is granted and if the ultimate decision of the

**1202**

Court affects the status of these documents, then the throwsters may resubmit the instant motion.

The throwsters also maintain that the subject matter waiver doctrine is applicable to work-product materials under precisely the same circumstances that it would be applicable to attorney-client material. This court has ruled that the subject matter waiver doctrine applies only to the attorney-client privilege. The rationale behind this holding is found on page three of the December 19 Order. The throwsters have presented no case law or legal theory which persuades this court that its earlier ruling was in error. Accordingly, this motion is denied.

This court also held that the waiver of attorney-client privilege by production of a communication between an attorney and a member of a "community of interest" does not effect a waiver of other privileged documents (relating to the same subject matter) between the same attorney and diverse members of the "community". The throwsters contend that because a "community of interest" is treated, by definition (for the purposes of attorney-client privilege), as a single client, the December 19 ruling of this court is erroneous. The court there stated that it would be "grossly unfair" to allow one client, because of an interest in a subject of mutual concern, to waive the attorney-client privilege of another client. When the attorney-client privilege is waived, "the privacy for the sake of which the privilege was created was gone by the *appellant's own consent* . . . ." Green v. Crapo, 181 Mass. 55, 62 N.E. 956, 959 (1902) (Holmes, J.) (emphasis added). Here the second client has not consented to the waiver; hence the motion is denied.

The throwsters contend that the rulings of this court relating to documents DRP0678 and DRP0695 are inconsistent. These documents are, however, distinguishable. In regard to the former it *must* be assumed that there was a breach of confidentiality; no such assumption can be made in regard to the latter. The motion to reconsider is therefore denied.

Finally, the throwsters question this court's finding that they have made an insufficient showing of substantial need and undue hardship to permit this court to order discovery of certain factual work product documents. After argument, this court remains convinced that the showing of need and hardship was insufficient to require production of the documents in question.

This order will be effective fifteen (15) days after the date of filing.

And it is so ordered.